

1   Jon T. King (Cal. Bar No. 205073)
    LAW OFFICES OF JON T. KING
2   856 Walbrook Ct.
3   Walnut Creek, CA 94598
    Telephone:  (925) 698-1025
4   Email:  jtk70@comcast.net

5   *Counsel for Plaintiff*



6

7

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                                                              KAW

11

12   JON T. KING,                          Case No. 13    0237

13              Plaintiff,

14   vs.                                    **COMPLAINT FOR:**

15   MICHAEL D. HAUSFELD and HAUSFELD       **Wrongful Termination in Violation of**
     LLP,                                   **Public Policy**
16

17

18              Defendants.                 **DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

Plaintiff Jon T. King ("Plaintiff") or ("King") hereby brings this action against Defendants Michael D. Hausfeld and Hausfeld LLP, seeks injunctive and declaratory relief, and damages, and asserts a cause of action herein for Wrongful Termination in Violation of Public Policy. Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This is a case about a bully. Defendant Michael Hausfeld is a prominent class-action lawyer based in Washington, D.C. He was fired by his prior law firm, then known as Cohen Milstein Hausfeld & Toll, PLLC ("Cohen Milstein") in November 2008 for reasons detailed herein. Mr. Hausfeld immediately formed a new firm, Defendant Hausfeld LLP, one that by his design is entirely devoid of any checks and balances on his authority, and surrounded himself with nearly all junior attorneys. Mr. Hausfeld spent lavishly to create the appearance of success, incurred a crushing debt-load, and leased expensive offices on K Street in Washington, D.C and London. He spoke often of showing his old law firm, and the legal community, that his prior law firm made a major mistake in firing him.

2.      Plaintiff was employed by Defendants as an attorney in the firm's San Francisco office from the firm's inception until Defendant Michael Hausfeld personally fired him in San Francisco on October 3, 2012. As detailed herein, Defendant Hausfeld fired Plaintiff because Plaintiff had repeatedly raised issues regarding Defendants' unethical and unlawful behavior. That behavior included (a) violation of rules governing conflicts of interest, including with respect to major Asian electronics manufacturers and, separately, with respect to major antitrust litigation against the National Collegiate Athletic Association ("NCAA"); (b) condoning surveillance of another law firm, Zelle Hofmann Voelbel & Mason LLP, that has housed within it Defendant Hausfeld LLP's San Francisco office from its inception; and (c) participation in unlawful client solicitation enterprises crossing state and international lines.

3.      Until his firing, Plaintiff was one of the lead attorneys for the plaintiffs in the

COMPLAINT

litigation captioned *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, Case No. C 09-1967 CW (NC), also known as the "*O'Bannon* case" and/or the "*Keller* case" (hereinafter, the "*NCAA* Litigation" or the "*O'Bannon* Litigation"), a nationwide class action pending in the Oakland Division of the United States District Court for the Northern District of California. That action has drawn, and continues to draw, intense national interest. Plaintiff represented putative classes of current and former NCAA men's Division I basketball and football players who assert antitrust and right of publicity claims and contend that the NCAA, its Division I member schools and conferences, Electronic Arts Inc. ("EA" or "EA Sports"), and others unlawfully used the players' images and likenesses in, among other things, rebroadcasts of archival games and video games in addition to a host of other products.

4. Legal ethics were an immediate casualty of Mr. Hausfeld's desire to lessen his debt, and to demonstrate fast success at his new firm in order to vindicate himself. Almost immediately, disputes with his old law firm boiled over into an acrimonious federal lawsuit. At issue were several million dollars in settlement funds from a class action that Mr. Hausfeld wanted to direct to his new firm. In the midst of mediation proceedings in the dispute with his old firm, presided over by United States Magistrate Judge Timothy Rice, Defendant Michael Hausfeld chose to secretly wire millions of dollars in disputed money to his London office. Magistrate Rice wrote that Mr. Hausfeld had personally acted in "bad faith," "took an extraordinary risk," "unilaterally chose to retaliate," and "rather than seek judicial resolution, which is the hallmark of our legal system, HLLP attempted to dispense its own form of justice. . . . HLLP acted in bad faith." Michael Hausfeld did not appeal the ruling. Magistrate Rice's findings are equally applicable regarding Defendants' conduct towards Plaintiff.

5. Unchastened by the major rebuke from a federal judge, Defendant Michael Hausfeld continued to perpetuate and encourage a culture at his firm that ethics were flexible, and that any

COMPLAINT

situation could be finessed.  The London office became a nexus for more elaborate schemes.  A major blow was dealt when English courts strongly rejected the concept of Mr. Hausfeld importing United States-style class actions to England.  His desire to devote more and more resources to that effort had been one of the primary issues in Cohen Milstein firing Mr. Hausfeld.  Mr. Hausfeld's next plan was to now target large individual companies as clients.  He began to analogize the firm to a defense firm, continually drew comparisons to himself and defense lawyers, and was frequently upset about the pay of defense lawyers and the large profits made by their firms as reported in the legal press.

6.      Many firm attorneys continually lamented the years of no profitability and bonuses, while firms that they believed to be their peers, such as leading defense firms, and firms such as leading hybrid firms Susman Godfrey LLP and Boies Schiller & Flexner LLP, who do both plaintiffs and defense cases, appeared to flourish.  Key firm management positions were given to those with particular personal debt and expense issues.

7.      In the quest to be rapidly retained by corporate clients, all vestiges of ethics, and morality, were cast aside.  Plaintiff called to the attention of firm management these ethical breaches, and was summarily fired by Mr. Hausfeld for doing so.  No normal human resources procedures were followed in the termination.  Mr. Hausfeld's actions were designed to intimidate, humiliate and isolate Plaintiff.

8.      In the midst of firing Plaintiff, Mr. Hausfeld with no prompting offered to pay Plaintiff an amount that his human resources consultant stated to Plaintiff was "more than he ever gave anyone" and that he "only agreed at the last minute to do it."  The condition was that Plaintiff never speak to anyone regarding the firm, in violation of Plaintiff's duties to clients, class members, co-counsel and courts.  Defendants continued to urge Plaintiff to accept their offer, sending unprompted "reminders" and unprompted "extensions."  Plaintiff informed them in writing that he

COMPLAINT

had no interest whatsoever in negotiating with them, writing on November 6, 2012 that "I did not ask for that proposed severance agreement that was put on my desk while I was being fired by Michael, and certainly not for any extension to consider it, and have never proposed any negotiation of its terms. It is not something that I'm interested in at all."

9.    Following the termination, Defendants failed to fully comply with numerous provisions of California law requiring production of personnel records, documents signed by Plaintiff as a condition of employment, and pay records. With respect to personnel records, Defendants produced only a handful of items, none of which was more recent than at least 15 months old. The evaluation forms contained therein were uniformly positive, as discussed herein. On October 17, 2012, the firm wrote that "Regarding your personnel file, your complete file as maintained in the ordinary course of our business has been provided to you."

10.   Additionally, Defendants, in truly petty retaliation, have refused to return all of Plaintiff's property that was left in his office, and have converted it to their own. Defendants have refused to provide any even basic inventory of the materials that they are keeping. Defendant Michael Hausfeld has further personally instructed numerous people within and outside the firm to never speak with Plaintiff.

11.   There is a substantial imbalance of power between Defendants and Plaintiff. Plaintiff is required to set forth an unusually detailed factual recitation herein, knowing well the resources of Defendants that will be directed at Plaintiff. Defendants will no doubt co-opt the very same arguments that they typically invoke *against* defendants in other cases, that the claims against them are "implausible" and pointing to prestige and successes other major cases.

12.   For eases of reference, a guide to the primary headings in the materials herein is as follows: "Plaintiff's Background, Duties and Performance Reviews" (pages 8-24); "Defendants' Ethics – Fiction and Reality" (pages 24-49); "Defendants Pressure Plaintiff" (pages 49-59);

COMPLAINT

"Defendants Fire Plaintiff" (pages 59-63); "Defendants' Violation of Public Policy" (pages 64-65); "Defendants' Long History of Questionable Conduct" (pages 65-76); and "Cause of Action" (page 76).

13.     Plaintiff seeks an injunction requiring Defendants to disgorge to class members all of the legal fees that they have obtained in numerous matters tainted by conflicts of interest. These ill-gotten fees amount to many millions of dollars. Plaintiff further seeks an injunction requiring Defendants to provide full and complete information regarding their conflicts of interest to all courts presiding over any matter affected by the conflicts described herein. Plaintiff further seeks an injunction requiring Defendants to institute and adhere to a robust conflicts of interest checking and evaluation system, and requiring Defendants to submit to oversight of an ethics monitor for at least three years that will prepare quarterly reports to the Court regarding Defendants' compliance with legal ethics. Plaintiff further seeks declaratory relief in the form of a declaration that Defendants' termination of Plaintiff was in violation of law, and further seeks an award of damages to be determined by a jury.

14.     Defendants in the past few years have positioned themselves as the protectors of retired athletes' rights, as well as the rights of other disadvantaged groups. In view of Plaintiff's personal knowledge of Defendants' activities, a latin phrase is appropriate – *Quis custodiet ipsos custodes?* – literally translated as "Who will guard the guards themselves" and often stated as "Who watches the watchmen?" Plaintiffs respectfully requests that the Court do so.

## PARTIES

15.     Plaintiff Jon T. King is an individual residing in Walnut Creek, California within Contra Costa County. At all relevant times referenced herein, unless otherwise noted, Plaintiff was employed by Defendants. Plaintiff has been, and continues to be, injured by the acts of Defendants including as described herein.

COMPLAINT

16. Defendant Michael D. Hausfeld is an individual residing in Fairfax, Virginia. He is the majority owner of Defendant Hausfeld LLP. Plaintiff has been, and continues to be, injured by the acts of Defendant Michael Hausfeld including as described herein.

17. Defendant Hausfeld LLP is a limited liability partnership formed under the laws of the District of Columbia. Plaintiff has been, and continues to be, injured by the acts of Defendant Hausfeld LLP including as described herein.

18. Whenever in this Complaint reference is made to any act, deed, or transaction of the Defendants, the allegation means that the Defendants engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

19. Plaintiff's investigation continues regarding potential responsibility of one or more additional defendants. Additionally, Plaintiff's investigation continues regarding the possibility of additional causes of action, as well as additional factual material, to be set forth in an amended complaint.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the jurisdictional minimum of this Court.

21. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Plaintiff lives within this District in Walnut Creek, California, has sustained and continues to sustain damage within this District due to Defendants' actions, was employed at all relevant times by Defendant Hausfeld LLP within this District at Hausfeld LLP's San Francisco office, a substantial part of the events or omissions giving rise to the claims herein arose within this District, including the termination of Plaintiff by Defendant Michael Hausfeld in Hausfeld LLP's San Francisco office, and

COMPLAINT

Defendants both transact repeated and substantial business within this District including at Hausfeld LLP's San Francisco office, and in connection with numerous federal court proceedings pending in this District's federal courts, as well as in State courts located within this District.

22. This Court has specific and general personal jurisdiction over Defendants, including because, *inter alia*, they: (a) committed the legal violations in this District as described herein; (b) routinely and systematically transact business in this District; (c) have substantial contacts with this District; and (d) sponsor events within this District.

## INTRADISTRICT ASSIGNMENT

23. Pursuant to Civil Local Rule 3-5(b), Plaintiff states that this action would properly be assigned to the Oakland Division, as a substantial part of the events or omissions which give rise to the claim occurred within the City and County of San Francisco and in Alameda County, and the events at issue further relate to the matter pending in this District in the Oakland Division in Alameda County before Chief Judge Claudia Wilken and captioned *In re NCAA Student Athlete Name & Likeness Licensing Litigation*, Case No. 09-1967 CW (NC) (also known as the *O'Bannon* and *Keller* litigation) (referred to herein as the "*NCAA* Litigation" or the "*O'Bannon* Litigation").

## FACTUAL ALLEGATIONS

## PLAINTIFF'S BACKGROUND, DUTIES, AND PERFORMANCE REVIEWS

### Plaintiff's Background

24. Plaintiff sets forth this information with reluctance. Without question, every matter on which Plaintiff has worked in his career is a product of a very collaborative team effort among clients, co-worker attorneys, co-counsel attorneys, expert witnesses, consultants, support staff, and helpful others. However, basic biographical information is useful to demonstrate that (1) there is

COMPLAINT

nothing in Plaintiff's professional background consistent with meriting the highly-unusual method and circumstances under which Defendants terminated Plaintiff; and (2) any purported reason eventually set forth by Defendants for their termination of Plaintiff is entirely pretextual.

25.     Plaintiff attended Santa Clara University in Santa Clara, California and obtained an undergraduate degree in 1992, graduating as a member of the national political science honor society.  He was a member of the school's NCAA Division I basketball team in the 1988-89 season, and a portion of the 1989-90 season, a fact which proved particularly useful in helping Plaintiff work with numerous clients and consultants and other interested parties in the *NCAA* Litigation, and in numerous other athletics-related matters.

26.     Plaintiff attended the University of California's Hastings College of the Law in San Francisco, and graduated in 1999.  Plaintiff graduated in the top 8% of his class, was elected by the members of the *Hastings Law Journal* to serve as its Editor-in-Chief, received the Order of the Coif academic commendation, and received awards as being the top student in four classes, including Complex Litigation and Trial Advocacy.  While in school Plaintiff was selected to serve as a judicial extern for the highly-respected Judge John E. Munter, who now co-presides over the Complex Civil Litigation Department for the Superior Court of California, County of San Francisco.

27.     While attending law school, Plaintiff received an employment offer from the law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden"), one of the largest and most prestigious law firms in the world, to join the firm first as a summer associate, and then as a litigation attorney in the firm's Los Angeles office.  Plaintiff worked for Skadden as a litigation attorney in 1999 and 2000 on various sports, entertainment, and other matters.

28.     In July 2000, Plaintiff was contacted by San Francisco attorney Fred Furth's son, Ben, who requested Plaintiff join Mr. Furth's San Francisco-based firm, The Furth Firm LLP, to work on numerous class action and others matters.  Plaintiff had attended law school with Ben Furth, and

COMPLAINT

through him had met his father Fred, one of the most accomplished and well-known attorneys in the United States at that time. The Furths specialized in antitrust litigation. The firm had undergone a very significant restructuring, was down to approximately four attorneys, and Plaintiff joined the firm to assist his friend as well as to participate in an exciting opportunity. Immediately after starting at the firm, Plaintiff met attorney Michael Lehmann, another attorney at the firm with whom he would work closely for the next 12 years. Mr. Lehmann figures prominently in the allegations of this Complaint.

29.     From approximately July 2000 until January 2008, Plaintiff worked at The Furth Firm, including very closely with Mr. Lehmann on numerous matters. While there, one of Plaintiff's principal cases was a successful case against a large law firm for legal malpractice and that stemmed from conflict of interest issues. In an antitrust matter, Plaintiff also represented the Golden Gate Bridge, Highway, and Transportation District, operator of the Golden Gate Bridge, a client that asked Plaintiff to continue representing it at the various firms described below.

30.     In approximately August of 2007, Mr. Lehmann left The Furth Firm to join with Defendant Michael Hausfeld and open the San Francisco office of the law firm of Cohen Milstein Hausfeld & Toll, PLLC. The day he announced his departure, Mr. Lehmann contacted Plaintiff and indicated that he wanted Plaintiff to join him at the new firm. He indicated that out of the 15 or so attorneys at The Furth Firm, he only wanted Plaintiff and perhaps one other attorney to join him at the new firm. He further indicated that it would take several months to get the logistics in place for the new office to function, and that Plaintiff should join him in January of 2008. Plaintiff also flew out to Washington, D.C. in the fall of 2007 to interview with Defendant Michael Hausfeld and discuss Defendant Hausfeld's plans for the San Francisco office.

31.     As agreed with Mr. Lehmann and Defendant Michael Hausfeld, Plaintiff joined the San Francisco office of Cohen, Milsten, Hausfeld & Toll PLLC in January of 2008, along with one

COMPLAINT

other attorney from The Furth Firm, Chris Lebsock. Within approximately one month, one other attorney, Arthur Bailey, Jr., joined the firm, bringing the office's total to four attorneys. Mr. Lebsock, along with Mr. Lehmann, figures prominently in the allegations of this Complaint.

32.     Within a matter of months of Plaintiff joining Cohen Milstein, it became extremely apparent, through many conversations with Mr. Lehmann, that something was going very awry in regards to Defendant Michael Hausfeld and Cohen Milstein. These issues would evolve into that law firm firing Defendant Michael Hausfeld in November of 2008, and further evolve into ensuing litigation between the two that is described herein.

**Plaintiff Joins Defendant Hausfeld LLP**

33.     Immediately upon Cohen Milstein firing Defendant Michael Hausfeld, he announced that he was forming a new law firm, to be called Hausfeld LLP. Mr. Lehmann also immediately informed Plaintiff that he and Defendant Hausfeld wanted all three of the other attorneys from the San Francisco office of Cohen Milstein to join the new firm. Mr. Lehmann further informed Plaintiff that he would be an equity partner in the new enterprise. Plaintiff accepted this offer and joined the firm in November of 2008.

34.     The San Francisco office was opened within the offices of the law firm of Zelle Hofmann Voelbel & Mason LLP ("Zelle Hofmann"), a very significant fact as detailed herein. Defendants repeatedly betrayed the trust of Zelle Hofmann. Numerous Zelle Hofmann attorneys and support staff had worked at the The Furth Firm with Plaintiff, Mr. Lehmann and Mr. Lebsock.

35.     Plaintiff spent significant time explaining to clients, case consultants, and others who read about Defendant Michael Hausfeld's falling out and firing by his old firm that, as he had been told, such matters were just a business dispute and a difference about whether to pursue foreign cases.

36.     Plaintiff devoted significant time helping to establish the new firm, including in

COMPLAINT

regards to the *NCAA* Litigation, and several other matters.

37.     Plaintiff was generally always among top three billers in the firm, a fact acknowledged repeatedly by Mr. Lehmann.

38.     On February 9, 2010, Robert ("Bob") Eisler, then an attorney at Defendant Hausfeld LLP and a member of the firm's Management Committee, sent an email to all the firm's 14 equity partners, including Plaintiff, titled "Non Equity Partnership."  The email included in pertinent part the following:  "the Management Committee is offering those partners who elect to do so the opportunity to change their status to Non Equity Partner.  Non Equity Partners will be paid the same guaranteed payments they currently receive . . . and would receive bonuses, at the discretion of the Management Committee, in years where the Firm is profitable.  Non Equity Partners would not be signatories to the Line of Credit, or liable for cash calls, or any other firm liabilities."

39.     The email continued that "Non Equity Partners will be eligible to seek Equity Partnership if they so choose.  The Firm does not view Non Equity partnership as an 'up or out' status.  To the contrary, Non Equity partnership is a no risk alternative for many of the fine attorneys in this Firm, which will allow them to share the Firm's profits in the form of a bonus in good years without exposing them to financial risk in difficult times.  Any Partner who is interested in changing his or her status to Non Equity Partnership should contact Bob Eisler by February 24, 2010."

40.     Plaintiff, having significant concerns about Defendants' activities, including the "bad faith" finding against it and numerous other observations, elected to switch to the non-equity status, as did two other equity partners, effectively converting them into employees as opposed to owners.  Notably, one of the other two was an attorney who, prior to that time, and subsequently until the present time is the attorney in charge of day-to-day oversight of the firm's financial matters.

**Plaintiff's Duties at Defendant Hausfeld LLP**

41.     With respect to the *NCAA* Litigation, Plaintiff's duties included principal

COMPLAINT

responsibility for factual research in all complaints; principal responsibility for client in-take, meetings, and relations; principal responsibility for discovery and expert witness team education and coordination; court appearances; taking Defendant depositions; principal responsibility for defending Plaintiff depositions; serving throughout most of the case as the only liaison between co-lead counsel firms in the litigation; and serving as the primary point of contact for various case consultants including Sonny and Pam Vaccaro and numerous other persons of interest.

42.     Plaintiff did virtually all of the factual research set forth in the original *O'Bannon* complaint, the subsequent Consolidated Amended Complaint which added a dozen additional antitrust plaintiffs, the *Oscar Robertson / Tate George / Ray Ellis* complaint, and the *Bill Russell* complaint.  Extensive files and emails memorialized on Defendants' computer system document these facts, and they will be uncontroverted.

43.     Plaintiff served as the lead discovery negotiator for several years with the NCAA's lead defense counsel, including obtaining production of their multi-billion dollar television contracts and many other items of note.

44.     With respect to depositions of NCAA personnel, Plaintiff deposed NCAA Director of Broadcasting Greg Weitekamp, and deposed Pat Battle, former President of defendant Collegiate Licensing Company / IMG.

45.     Plaintiff travelled all over the country to meet with the clients, communicated with them via phone, and discussed any issues, got to know them, and in some instances their families, discussed document preservation and production issues, and a myriad of other case issues.

46.     With respect to depositions of the plaintiffs in the *NCAA* case, Plaintiff defended the deposition of Oscar Robertson, and was involved in either the direct defense or extensive preparations for the defense of virtually every single one of the approximately 12 antitrust plaintiffs.

47.     Plaintiff organized and spent years working with the numerous discovery and other

COMPLAINT

case teams set up by Defendant Michael Hausfeld in *NCAA*. These include teams working with testifying expert Roger Noll, Ph.D., Dr. Noll's support firm OSKR, LLC; testifying media expert Larry Gerbrandt; a team devoted to obtaining discovery from Defendant NCAA; a team devoted to defendant Electronic Arts Inc. ("EA") or ("EA Sports"); a team devoted to obtaining discovery from defendant Collegiate Licensing Company ("CLC") and its parent company IMG Worldwide ("IMG"); a team devoted to obtaining discovery from several dozen NCAA member conferences that were served subpoenas for documents; a team devoted to obtaining discovery from six television networks that were served subpoenas for documents; a team devoted to serving and negotiating public records requests submitted to dozens of public universities across the country.

48.     With respect to court appearances, Plaintiff, at the specific and repeated requests of Defendant Michael Hausfeld and Michael Lehmann, attended virtually every hearing in the case, specifically, those before current Chief Judge Claudia Wilken, former Chief Judge Vaughn Walker, Magistrate Judge Nathanael Cousins, and a hearing in New Orleans before the Judicial Panel on Multidistrict Litigation, a panel of seven federal judges.

49.     Plaintiff solely argued on behalf of the Antitrust Plaintiffs at least two major hearings in the *NCAA* Litigation. In the first, in New Orleans, before the Judicial Panel on Multidistrict Litigation, Plaintiff successfully argued before the Panel to prevent the NCAA's arguments from prevailing regarding the possibility of transfer of the case out of Oakland and to Indiana. In the second, Plaintiff successfully argued in 2011 before now Chief Judge Wilken against Electronic Arts' Motion for Judgment on the Pleadings, a motion that if successful would have forever terminated EA's liability on the antitrust claims. Plaintiff additionally made presentations before Magistrate Judge Cousins in at least two other hearings.

50.     With respect to other deponents, Plaintiff extensively prepared with co-counsel and assisted with his deposition of ESPN Broadcaster Jay Bilas. Plaintiff additionally worked with co-

counsel in regards to a long-running, and eventually successful, effort to obtain the deposition of former NCAA Executive Director, Walter Byers, whose groundbreaking book *Unsportsmanlike Conduct*, exposed the inner-workings of the NCAA from the perspective of Mr. Byers, a man that presided over the NCAA for some three decades.

51.     Plaintiff wrote major portions of numerous key legal briefs in the case, including, the successful motion to obtain the deposition of NCAA President Mark Emmert, the briefing submitted to the Judicial Panel on Multidistrict Litigation, and numerous case management conference statements.

52.     Additionally, Plaintiff served as a point of contact for case consultants Sonny and Pam Vaccaro, including negotiating six subpoenas for documents sent to them by the NCAA, and meeting with them to locate and produce documents.  The Vaccaros' truly exceptional commitment to the *NCAA* Litigation and to the rights of current and former college athletes has been extremely well-documented by the national media.

53.     With respect to serving as a point of contact for other individuals, extensive documents and emails residing on Defendants' computer systems demonstrate that Plaintiff was a point of contact for, and met with numerous very prominent individuals and entities with respect to the *NCAA* Litigation.

54.     Plaintiff also consulted with numerous third-party subpoena recipients, such as the agents of numerous Plaintiffs, who were served with subpoenas.

55.     Defendant Michael Hausfeld personally invited a truly staggering number of firms to join the case as his co-counsel, always as some form of political deal relating to other matters. Additionally, as detailed herein, Defendant Michael Hausfeld crafted a scheme by which he would require financial contributions from those firms to join the case, while simultaneously concealing that he ordered Hausfeld LLP not to contribute to the litigation fund.  In other words, the other law

COMPLAINT

firms unknowingly were "paying his freight." This overstaffing resulting in massive inefficiency and a stunning amount of attorney time being spent on the case. One need not simply take Plaintiff's word for it. Even in the public record, there is corroborating evidence. *See In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, U.S. Dist. Ct., N.D. Cal., Dkt. 244, at 4 (Defendants' co-lead counsel Hagens Berman LLP stating that Defendants' actions in managing the case and overstaffing, "including over a dozen firms in meetings and conference calls," have caused "friction" and "tension," violate the duties of a co-lead counsel appointment," and that Defendants "rebuffed" efforts at communication).

56. The attorney lodestar, meaning the reported value of attorneys' time in case from Hausfeld's group of firms, was well in excess of $20 million, even as of many months ago, with significant amounts of time missing from various firms.

57. Of particular note, Plaintiff was the only consistent presence and point of contact in the *NCAA* Litigation from Hausfeld's team. To illustrate a few limited example, Defendant Michael Hausfeld's relationship with many other plaintiff firms in this case is extremely "up and down." Plaintiff would frequently be specifically instructed directly by Defendant Hausfeld that certain firms were suddenly out of favor, and were not to be given any more work. Then sometimes a particular firm would be especially in favor, and Defendant Hausfeld would specifically instruct Plaintiff to give that firm as much work as possible. Then, the entire calculus could be reversed.

58. Moreover, there was a stunning amount of turnover on the case team among what were supposed to be the key day-to-day personnel. For example, one partner began the case as a key member, and then asked to be removed because of conflict of interest concerns. Another was added to the case team, and then left the firm. Another then joined the case team, stated to Plaintiff, "I hate this case" because of the required frequent dealings with Mr. Hausfeld, and eventually was reassigned off of the case for reasons not yet clear to Plaintiff. Another attorney in the San Francisco

COMPLAINT

office was put on, and removed from, the day-to-day case team many times by Mr. Hausfeld for no apparent reason and not of his own choosing, so much so that it became a running joke among case team personnel.

59.     Defendant Hausfeld also participated with Plaintiff in various court-ordered and publicly-known mediation discussions including with defendant EA.  On many occasions, Defendant Hausfeld would evidence a virtually total lack of knowledge about EA's products at issue, and would be repeatedly corrected by both EA's outside counsel and EA executives, for example, regarding the fact that EA no longer makes a basketball game and has not done so for numerous years, and on the issue of whether "classic" players appear in EA's football games.  Perhaps most troublingly, several years into the case, Defendant Hausfeld announced to numerous members of the internal and external case team, that he had just learned that the NCAA itself does not benefit from college football.  This fundamental fact had been raised specifically to Mr. Hausfeld many, many times.  Plaintiff spent significant time handling calls from co-counsel and others connected with the case who would be extremely confused about Mr. Hausfeld's lack of knowledge regarding the collegiate sports industry and the case in general.  Plaintiff always sought to, and did, bolster Mr. Hausfeld's credibility, being the "fact man" where needed with Mr. Hausfeld being the "big picture visionary."  In tandem, it was effective and kept the litigation moving forward.

60.     Unfortunately, these oddities were compounded by the involvement of Mr. Lehmann in the case.  While an accomplished antitrust brief writer, Mr. Lehmann's judgment and tactics in client relations were suspect. For example, Mr. Lehmann in the presence of Plaintiff specifically promised on the phone to a prospective plaintiff in the *Eller v NFL* litigation that this Plaintiff would receive a slot in the NFL draft as a part of any settlement, and that such things were "common" in settlements.  Needless to say, that representation was entirely false.  Various other unusual, and credibility challenging, situations frequently occurred.

COMPLAINT

61. Plaintiff was invited to make presentations at numerous events around the country. For example, he presented at the American Bar Association's 2010 National Convention, at the group's panel titled "From Music, Film and Art to Motorcycles and Other Sports: Hot Issues and Disputes in Entertainment, Art and Sports Licensing Deals," along with one of the NCAA's lead attorneys. In March 2011, Plaintiff was invited to speak by Harvard Law School at its "Sports Law Symposium" along with *NCAA* Litigation Plaintiff Ed O'Bannon and case consultant Sonny Vaccaro. In both 2010 and 2012, Plaintiff was invited to speak at Santa Clara University's "Sports Law Symposium" in regards to the *NCAA* Litigation, and also was a panelist at other events at that university. Plaintiff also was a panelist at Florida Coastal University's 2010 Sports Law Panel titled "Exploitation of the Student Athletes? Evaluating *Bloom*, *Oliver*, *O'Bannon* and *Keller*." Plaintiff always sought to, and did, represent the clients, firm, and Mr. Hausfeld in a very professional manner.

62. Notably, at the 2012 event, Plaintiff was sought out after his presentation by a member of a very high-profile organization regarding the litigation who wished to meet with Plaintiff and Defendant Hausfeld regarding the case. Plaintiff immediately informed Defendant Hausfeld, who on a call with Plaintiff and Hausfeld's assistant referred to it as "a potential breakthrough meeting."

63. In April of 2012, Plaintiff was selected to Vermont Law School's Sports Law Institute Board of Advisors, along with individuals such as ESPN's Buster Olney and *Sports Illustrated*'s Jon Wertheim.

64. Plaintiff further developed relationships with award-winning reporters who had interest in other topics relating to the firm and its cases, and specifically made introductions to Defendant Hausfeld on several occasions.

65. Plaintiff developed relationships with numerous reporters in regards to the *NCAA*

COMPLAINT

Litigation and other matters, assisting in responding to inquiries and exchanging useful background information regarding the collegiate sports industry. For example, Mr. King has been quoted and cited in numerous publications and outlets regarding sports and competition law matters, including in *The New York Times*, *The Wall Street Journal*, *USA Today*, *Sports Illustrated*, *The Atlantic* (formerly known as *Atlantic Monthly*), *Forbes*, *Playboy*, *ESPN.com*, *Bloomberg News*, *Sports Business Journal*, *The Chronicle of Higher Education*, *Yahoo! Sports* and many others, and been interviewed on, for example, NPR Radio, CBS Radio, and numerous other forums, sometimes several times.

66.    Plaintiff additionally worked extensively with the production crews from *Frontline* and *HBO Real Sports*, who did segments and features on the *NCAA* Litigation, and travelled to Nevada repeatedly to work with those crews in their filmed interviews with lead plaintiff Ed O'Bannon, and to protect his, the firm's, and the case's interest at all times.

67.    Plaintiff does not set forth the above information regarding media interactions out of any self-aggrandizement and delusions of self-importance. It is simply factual, and certainly met with approval of Defendants, as to this day, at least eleven (11) of the articles are posted on Defendants' website for marketing purposes. Most importantly, Plaintiff always sought to, and did, serve the interest of the firm, its cases, its clients, and class members.

68.    Plaintiff was further recognized as a top plaintiff's attorney by Levick Strategic Communications, one of the nation 's leading crisis management firms for corporations and individuals facing high profile legal issues.

69.    Until Defendants fired him, Plaintiff represented the Golden Gate Bridge, Highway & Transportation District, the governmental entity that operates the world famous Golden Gate Bridge and various transit systems, as one of the plaintiffs in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.).

**Plaintiff's Performance Reviews by Defendants**

COMPLAINT

70.     Plaintiff received numerous positive performance reviews while at Hausfeld, including from Defendant Michael Hausfeld, and Defendant Hausfeld LLP Partners Michael Lehmann and Chris Lebsock.  For example, in a document titled "Summary Evaluation of Jon King," created in approximately January 2009, Hausfeld partners Michael Lehmann, Chris Lebsock and Brian Ratner are listed as "Evaluators."  For the question "Does the lawyer demonstrate high moral character, professional integrity and honesty?" the response was "Excellent."  For the question "Can you rely on the word of this lawyer?" the response was "Excellent."  For the question, "Does the lawyer have a strong reputation with judges and other attorneys?" the response was "Excellent."  For the question, "Does the lawyer develop good working relationships with clients?" the response was "Good – Excellent."  In response to the question "Does the lawyer commit the effort and hours to a project to make it timely and of high quality?" the response was "Excellent – Jon is a very hard and efficient worker."  Over the course of the remaining 27 other questions, 25 of the responses use the word "excellent" and the remaining two reference "good."

71.     In the "Additional Questions" section of that early 2009 Review, the following comments are set forth in response to "Have you entrusted this lawyer with responsibility for substantial matters and if so, what was the result?":   "Jon's work is always good" (attributed to Chris Lebsock) and "Yes, always superlative" (attributed to Michael Lehmann).  In response to the question "What are this lawyer's strongest characteristics?" Chris Lebsock stated "Jon always comes through when needed" and Michael Lehmann stated "Work ethic, enthusiasm and intelligence, client development."  In response to the question "Have you heard comments regarding this lawyer from clients, judges or others?" Chris Lebsock stated "Jon is well respected in the antitrust bar in San Francisco," and Michael Lehmann stated "From lawyers extolling him."  The evaluation form further notes that Mr. King received a pay raise in connection with the review.

72.     On or about November 23, 2009, Mr. Lehmann completed an "Evaluation Form"

COMPLAINT

evaluating Plaintiff's performance in 2009. The review was again uniformly positive. For example, in response to "Can you rely upon the word of this lawyer," Mr. Lehmann indicated "Excellent." Mr. Lehmann gave the same response in regards to "Does the lawyer have a strong reputation with judges and other attorneys?" Numerous other categories were all scored as "Excellent," including "Is the lawyer's writing clear and concise?," "Does the lawyer have good research skills?," "Does the lawyer have the ability to assume primary responsibility for significant client matters?," "Does the lawyer demonstrate the ability to supervise and lead subordinates and staff members in an effective manner?," "Does the lawyer consistently meet deadlines?," and numerous other categories, again all scored as "Excellent," the top category available on the form. In the comments section, in response to the question "Have you entrusted this lawyer with responsibility for substantial matters and if so, what was the result?," Mr. Lehmann wrote "Yes – NCAA, Rackable, Auto Lights, etc." In response to "What are this lawyer's strongest characteristics?" Mr. Lehmann simply wrote "Excellent overall." In response to "Have you heard comments regarding this lawyer from client, judges, or others?" Mr. Lehmann wrote "Yes – all complimentary."

73.     Plaintiff believes that one or more additional Hausfeld attorneys, including Mr. Lebsock, completed similarly positive reviews at the end of 2009, but has not been provided with copies.

74.     Plaintiff believes that no formal reviews of any Hausfeld attorney, including Plaintiff, were done in the 2010 and 2011 years.

75.     On July 6, 2010, following a court appearance in San Francisco in the *NCAA* Litigation for which Mr. Hausfeld did not travel to the West Coast, Mr. Hausfeld sent the following email to Plaintiff: "Jon and Steig [Olson, another attorney then at the Hausfeld firm], Congratulations on a job, as reported, very well done. I have, and continue to have, the utmost confidence in you both." Mr. Lehmann also was copied on this email.

76.     On August 17, 2010, following the successful jury trial verdict in a case in state court in Marin County, California obtained by Chris Lebsock and Plaintiff, Michael Hausfeld wrote a letter to Plaintiff stating: "Jon, Chris, Congratulations. And don't be shy. Please tell us about your success." Plaintiff believes that this was and remains the only successful jury trial verdict obtained by any attorneys at the Hausfeld firm during its entire existence, and further, believes it to be the only jury trial conducted by any firm attorneys during the firm's existence. Additionally, Plaintiff, along with Mr. Lebsock, defended a third-party witness in a regulatory proceeding brought by FINRA, the Financial Industry Regulatory Authority. Again, to Plaintiff's knowledge, this was the only occasion in the history of the firm in which an attorney participated in a regulatory trial proceeding.

77.     On June 14, 2011, Michael Lehmann sent an email to Michael Hausfeld stating with respect to Plaintiff that he had let Plaintiff know that "we valued his work, wanted him to have day-to-day managerial authority over the [*NCAA* Litigation] case and wanted him to interact more extensively with you." Following Plaintiff's termination by Defendants, this email was produced in response to Plaintiff's request under California employment law for production of personnel files. The response has been significantly, and suspiciously, incomplete, as noted herein.

78.     On July 9, 2011, the firm's Management Committee sent a memorandum to the firm's "NCAA Case Team," referencing the status of Plaintiff as the "Prime Attorney" on the NCAA case, and stating that "As the prime attorney on the case, Jon is responsible for the day-to-day management of the case as well as the management responsibilities set forth below." The Prime Attorney designation in fact went back to the inception of the case, at approximately which time the firm adopted that nomenclature to designate the attorney with day-to-day responsibility for the everyday workings of the case, of course to be exercised in continuing consultation with more senior attorneys at the firm.

COMPLAINT

79.     On December 23, 2011, Plaintiff received a memorandum from the firm's Management Committee titled "Guaranteed Payments" and indicating Plaintiff received a pay raise effective January 1, 2012.

80.     In mid-2012, in another matter, a Hausfeld partner from the D.C. office sent several emails to Plaintiff, that presently reside on the firm's server, praising Plaintiff for his work on the case, specifically, in preparing several class representatives and co-counsel for those clients' depositions, including attending those depositions as specifically requested by the firm.

81.     In late August 2012, on the day that the major *NCAA* Litigation class certification brief and expert reports were due, Plaintiff emailed Mr. Hausfeld and Lehmann.  Mr. Lehmann had been on vacation in the ten days leading up to the filing of the class certification brief and expert reports, but had been the principal drafter of the first draft of the brief while Plaintiff and others worked extensively with three experts on their voluminous reports and exhibits.  Plaintiff then called Mr. Lehmann who was still on vacation, but could not reach him and left a voice-mail.  Plaintiff then called Mr. Hausfeld, and Plaintiff stated that key claims were entirely left out of the brief to be filed that day, and could be waived if not referenced.  These were particular causes of action that were very important to Mr. Hausfeld and that he had stressed since prior to even the filing of the initial complaint in the case.  Mr. Hausfeld immediately agreed and was very appreciative in the conversation.  Plaintiff followed up with an email to Mr. Lehmann, noting the issue.  Mr. Lehmann immediately responded by email, stating "Good catch" and they then amended the brief.

82.     In early September of 2012, Defendant Michael Hausfeld sent an email to all firm personnel praising the firm's work on the NCAA class certification filing materials and two other recent major filings in other cases.

83.     Additional internal documents reflect Plaintiff's experience, skills and reputation, including the "Goals and Skill Evaluation (December 2009)" and "Professional Development 2008

COMPLAINT

Review" submitted the firm's Management Committee and other evaluating groups.

84.      Numerous other emails from Defendant Michael Hausfeld and Mr. Lehmann reflect praise for Plaintiff's work, with Mr. Hausfeld writing various ones stating "Nicely done" or similar words to that effect from his firm and multiple personal email addresses.  Review of Defendants' emails system will similarly reveal numerous complimentary emails from others with which Plaintiff worked on the *NCAA* Litigation and many other matters.

85.      Notably, four hours after Defendants fired Plaintiff, the following email exchange occurred on October 3, 2012.  Kelly Haire, the firm's outside human resources consultant with whom Defendant Michael Hausfeld fired Plaintiff, wrote, in consultation with Defendants: "Jon, would you like to take on the Insurance Brokerage case?  The clients are the Golden Gate Brige District and Redwood Oil?  If you are interested in doing this, then we can figure out the mechanics of how to make it happen.  There are some recent emails where important decisions are in the process of being made, so I would like to know your view on this."

86.      Plaintiff responded an hour later, stating "Kelly, given that the Hausfeld firm terminated me five hours ago, I am unable to do so."

87.      Thus, even after terminating him, the firm recognized Plaintiff's capabilities, as presumably they would not try to refer clients to him, particularly one as well known as the Golden Gate Bridge District, if they believed that the clients would receive anything less than excellent, ethical, and professional representation.


**DEFENDANTS' ETHICS:  FICTION AND REALITY**


**Defendant Hausfeld LLP's Statements Regarding Ethics**

88.      From the inception of Hausfeld LLP, Defendants made it a particular point, both

COMPLAINT

publicly and internally, to repeatedly stress that they would avoid any semblance of conflicts of interest.  For example, on January 27, 2009, Hausfeld LLP issued a press release titled "Hausfeld LLP Launches Washington, DC Office as Global Headquarters; Names New Partners."  Its sub-headline was "Global claimants law firm opens new K Street office and will provide *conflict-free litigation services* to domestic and international clients." (emphasis added).[1]  The press release continued that the firm "is focused on providing conflict-free litigation services to global plaintiffs – individuals and organizations" and quoted Mr. Hausfeld as stating that firm "is singularly dedicated to delivering high caliber, aggressive representation for claimants that is free from conflicts that plague leading global transactions firms engaged on both sides of the courtroom."  The release again reiterated that the firm "is a global claimants law firm providing conflict-free litigation services."

89.     Hausfeld LLP repeated the "conflict-free" language numerous times, for example in its February 17, 2009 press release titled "Hausfeld LLP Launches London Office."  On its LinkedIn page, its states "Our firm is focused on and committed to delivering conflict-free litigation services to global plaintiffs – individuals and organizations – in the areas of antitrust/competition law, human and civil rights, mass torts, environmental threats, securities fraud, and consumer protection." Defendants have made numerous other similar public representations about being "conflict-free."

90.     The November 2012 version of the "Hausfeld LLP Firm Summary" notes, in regards to the London office that "As a claimant practice, we are also typically 'conflict-free,' enabling us to take on matters such as claims against financial institutions or banks that other City law firms are often conflicted from acting on." (page 43).

91.     In its "Hausfeld LLP Employee Handbook," the firm states the following at page 4:

**Ethical Standards**

"In order to maintain the highest integrity and credibility in all our business actions,

---

[1] <http://www.hausfeldllp.com/pages/press_releases/162/hausfeld-llp-launches-washington-dc-office-as-global-headquarters;-names-new-partners> (last visited January 16, 2013).

COMPLAINT

employees of Hausfeld are expected to abide by high ethical standards to ensure that they act in the best interest of the Firm and in the public interest that Hausfeld seeks to serve.  All employees must scrupulously avoid any activity that creates or appears to create a conflict of interest.  Failure to abide by both the intent and meaning of this policy will result in disciplinary action up to and including termination."

92.     In its 2011 Handbook, the firm further states that "Any employee who engages or wishes to engage in any activity or outside employment that could interfere with or appear to interfere with his or her position at Hausfeld or the business in which the Firm is involved, must obtain prior permission to do so from his or her supervisor and the Operating Committee."  It continues that "It is not the organization's policy to prohibit employees from working in other jobs, providing: . . . The work does not involve a conflict of interest." (Page 15).

93.     Defendant Hausfeld LLP states on its website that it "ranks among the world's top claimants' firms," that it provides "sterling representation to its clients," that it is "dedicated to providing world class service," that its personnel "bring the experience to deliver among the best in domestic and international legal services," that "We offer comprehensive protection of our clients' rights, wherever they may have been infringed," that it maintains "steadfast integrity, and that Defendant Michael Hausfeld is "one of the country's top civil litigators." The firm's website further quotes Defendant Michael Hausfeld as stating that the firm "is singularly dedicated to delivering high caliber, aggressive representation for claimants that is free from conflicts."

94.     The firm's "Procedures Handbook for California Employees," prepared in 2009, references "the Firm's mission to provide excellent legal services to clients" (page 3) and that "We strive to deliver high-quality services, while maintaining a good relationship with our clients." (page 8).  An internal document with subheadings for "Vision," "Mission," and "Values" to includes, for firm values, that "We will endeavor to exceed the expectations of our clients in all aspects of their legal representation."

95.     At the time of the firm's formation, Michael Hausfeld prepared a one-page document

COMPLAINT

titled "Hausfeld Business Fundamentals" and distributed it to the firm's attorneys, including Plaintiff

King.  It included the precepts of "Create trust and maintain it, and "Your word is your bond."

96.     The firm's "Procedures Handbook for California Employees" further notes that

internal complaints should be reported to "your supervisor, the Chief Operating Officer or to a

member of the Management Committee" and that "All complaints will be investigated promptly."

(page 4).  It further states that the firm will then conduct "a fair investigation," and that "In order to

assist us in protecting your privacy and the privacy of your co-workers, we ask that you also keep the

complaint confidential."  The 2011 Handbook further notes that concerns can be raised with "any

member of the Operating Committee." (page 5) and that supervisors are "required by Hausfeld

policy" to "immediately report" issues to "Human Resources and/or the Operating Committee."

(page 6).

97.     The Handbook further states that "You will not be subject to reprisal for having made

a complaint." (Page 4).  It further states that "the Firm will take appropriate disciplinary action

against anyone who attempts to retaliate against employees who complain" and that "Disciplinary

action may include counseling, written warning, demotion, discharge, or any other action deemed

appropriate by the Firm." (Page 4).

98.     The Employee Handbook further states that "Employees can raise concerns and make

reports without fear of reprisal."  (page 6).

99.     The Employee Handbook states this at page 7:

**Open Door Policy**

As part of your contribution to Hausfeld, you are encouraged to share your ideas,
questions, concerns and suggestions. If you have a job-related problem, complaint or
grievance, the Firm wants to make sure that you are given an opportunity to have the
issue promptly and fairly resolved. You should contact your supervisor to discuss
ideas that may help improve services, working conditions, member service, morale,
work satisfaction, etc. If a problem cannot be resolved at that level, you have the right
to consult with the Operating Committee or Human Resources.

. . .

COMPLAINT

No reprisals will be taken against a staff member as a result of having chosen to bring a problem or issue to light. Your thoughts about your employment with Hausfeld are very important, and we hope that you will be willing to share them so that we can continue to build a stronger organization.

100.    The Firm's "Employee Handbook," issue in mid-2011, details "the Firm's general policies" (page 1). It elsewhere outlines that the Handbook details the "policies, practices" and "guidelines" of the firm. (Page 33). It opens with a "Letter from the Chairman" signed by Mr. Hausfeld, identified as the Chairman of Hausfeld LLP. The Letter states that "Employees are a vital part of our organization." The Letter further states that "Although we have accomplished a great deal and received wide recognition, our continued success will be determined by our actions today." The Letter further states that "In all of our activities, we work cooperatively together to meet the needs of our clients."

101.    The Employee Handbook states at page 5 that "employment decisions at Hausfeld will be based on merit, qualifications and abilities."

**Defendant Hausfeld LLP's Actual Ethical Culture**

102.    Despite the public and internal representations regarding the firm's ethics, the reality of those ethics was a different matter, particularly with respect to Defendant Michael Hausfeld, and eventually, with respect to firm partners Michael Lehmann and Chris Lebsock. They both were financially beholden to Defendant Hausfeld, experiencing money issues and, frankly, extreme greed, as discussed herein. Both were members of numerous of the firm's management committees.

103.    Immediate and crushing debt obligations incurred by the firm impacted a myriad of decisions. A number of structural and practical issues impeded its ability to rapidly escape debt and become profitable. For starters, the firm at its formation and essentially to this day is the largest exclusively antitrust class action firm of its size. It has essentially no real diversification, meaning that all of its potential significant revenue is to be derived from settlements in antitrust class action

cases, which can often take at least five and not uncommonly even upwards of 10 or more years to resolve and obtain any legal fees. And of course, many cases simply do not resolve favorably.

104.    Even in the event of a favorable class action settlement, what often is not known to the general public, or even other attorneys not intimately familiar with the vicissitudes of class action practice, is the sometimes dozens of co-counsel firms that divide up any legal fees that are awarded. Additionally, Defendant Hausfeld in the majority of his cases owes referral fees to certain counsel, for example, "East Coast Attorney A" as described herein, whose standard take is 10% of Defendant Hausfeld's legal fees. Additionally, the firm frequently participates in paying off class action objectors, meaning those that raise objections to settlements and/or legal fee awards, further eroding the firm's take.

105.    Additionally, the firm has extremely expensive leases on prime locations in Washington D.C. and London, incurs very significant expenses to pay expert witnesses and other case expenses, would routinely and systematically travel in lavish style, and pay relatively high base-salaries as compares to other plaintiffs' contingency-fee class action firms.

106.    Further compounding the inescapable realities of class action practice, Defendants were continuing to spend wildly, and all on huge amounts of borrowed money. The firm for several years had seemingly no financial controls at all, but was dedicated to presenting an immediate image of massive success. Members of the firm, most principally Mr. Hausfeld but several others as well, had a borderline obsession with monitoring their old firm, Cohen Milstein, sending frequent emails with news of any supposed misstep of that firm in any case. Mr. Lehmann was frequently predicting their firm's imminent demise, stating phrases such as "They can't keep their lights on!" with glee.

107.    The firm eventually repeatedly tried, unsuccessfully, to get out of its expensive K Street lease in Washington D.C., but has been unable to find any takers. As to the San Francisco office, the initial plan was to spend just a few months being hosted by the Zelle Hofmann firm. Due

COMPLAINT

to lack of funds, to this day the Hausfeld SF office is within Zelle's office. The firm went through a series of internal staff layoffs in all offices, and permanently shut down its New York office after a partner chose to leave the firm.

108. The firm also exhibited a governance structure, or more appropriately stated, a lack of a governance structure, that allowed Mr. Hausfeld, perhaps for the first time in his career, to truly do as he pleased. He was free of any checks and balances, and specifically set up the firm's partnership agreement to reflect that. Having been fired by his prior firm, Cohen Milstein, he made certain to eliminate the possibility of any disagreement with his positions. Notably, none of the more senior antitrust attorneys from Cohen Milstein had joined him at his new firm. He was essentially surrounded by a group of junior, inexperienced attorneys in a legal and business sense, who had no ability to question his decisions. Essentially, none of them had ever been a partner before, or had any familiarity with working with lenders or firm management issues.

109. Eventually, even Michael Lehmann would, in candid moments on more than one occasion, remark to Plaintiff and others with respect to Mr. Hausfeld that "Maybe Steve Toll was right," meaning, Mr. Hausfeld's former partner at Cohen Milstein, who had the ability to challenge Mr. Hausfeld's decisions, was sorely missed.

110. The firm further experienced a highly-unusual level of turnover. Mr. Hausfeld is on at least his fifth assistant in just a few years. Shortly after the founding of the firm, one of the four main founding partners, Bob Eisler, left the firm. Most tellingly, in London, the principal partner from the Cohen Milstein era left the firm at the time of the transition to the Hausfeld firm. One of the two other main partners there, Vincent Smith, left the firm soon after. More recently, Scott Campbell, the primary senior associate, left the firm. At least one more of the partners in the United States offices asked to switch from an equity partner to non-equity partner, and was refused.

111. As noted above, the reality of funding the firm's London office became an immediate,

COMPLAINT

pressing concern.  Defendant Michael Hausfeld sought to have a prominent Minneapolis-based firm fund it.  Defendant Hausfeld stated internally that the firms would "open up their books to each other" in due diligence.  That firm soon declined to partner with Mr. Hausfeld.  Defendant Michael Hausfeld then sought to partner with at least two other prominent plaintiffs' firms.  Those firms quickly declined.

112.    Next, Mr. Hausfeld had meetings with a number of investment firms seeking to inject any funds possible to allay the debt load of the London office.  Those entities included:  Burford Capital; Calunius Capital; Credit Suisse; Innovest; Juridica; and at least one hedge fund.  None of these entities agreed to fund Defendant Hausfeld's endeavors.

113.    Eventually, Defendant Michael Hausfeld obtained some type of additional funding from Citibank to cover both the United States and London operations of the firm, and also pledged as collateral investment accounts and property. The firm has renegotiated its credit line with Citibank. The firm's partners were asked to sign additional documents pledged personal assets as security.

114.    Plaintiff notes the financial distress of Mr. Hausfeld's London office project, designed to inject U.S.-style class actions into Europe, and the subject of testimony in the federal court matter described herein, is also detailed in a February 2012 article about Mr. Hausfeld's London office in Global Competition Review and titled "The Great Gamble."
<http://www.hausfeldllp.com/content_images/file/2012_03_08%20GCR%20-%20The%20Great%20Gamble.pdf> (last visited January 16, 2013).

115.    Defendants have posted the article on their website and it states:  "[Michael Hausfeld's] latest project – the latest empire he seeks to build – might be the one he can't conquer . . . Progress has been slow – some say stagnant . . . It was, in many ways, the undoing of his tenure at his former firm . . . his firm's London office has been a major investment that has seen precious little return . . . one of the more notable setbacks came in 2010, the UK's court of appeals . . . ruled that

the attempt at a US-style class action against [British Airways] was 'fatally flawed' from the outset . . . The whole process has been frustrating, Hausfeld says . . . The two original partners in the office have left the firm.").

116.    The article continues: "The London office was a major investment for Cohen Milstein. Records indicate the firm poured several million dollars into the office, including rent, expenses and salaries for the three partners and other junior lawyers working there. According to records cited in court documents, the office lost close to US$2.6 million in 2007 before turning a small profit the following year.  But back at firm headquarters in DC, things had begun to quickly spiral out of control. In early 2008, it became apparent that the firm was struggling financially. Fees from several major litigations had yet to come in, and eventually the partners had to turn to the bank to get an extension on their typical line of credit. Meanwhile, Hausfeld's vision of a European litigation practice – as well as the general direction of the firm – had created friction within the partnership, Hausfeld and others say."

117.    The article continues that "A source familiar with the situation says Hausfeld's ambitions for the London office exceeded those of Cohen Milstein financially rather than philosophically. When the London office opened in 2007, the firm provided it with a five-lawyer staff and a US$3 million budget. By the following year, Hausfeld told the firm he wanted to double the office's budget and number of lawyers – something many of the firm's other partners found unpalatable, given the still-dim prospects for European class actions."

118.    The article continues that "Other Cohen Milstein partners saw the same philosophical chasm, including "severe disagreements on how to manage the firm, how to run practice groups, where to put our resources and how to go forward as a firm," said Richard Lewis, partner at Hausfeld and former Cohen Milstein partner, during court testimony. That friction, coupled with the money woes, left the firm on a precarious footing and struggling to make even the most basic decisions.

COMPLAINT

While no one but those involved can know the intimate details of Hausfeld's eventual removal from the firm, many of the allegations from both sides came to light during a four-day hearing before US Magistrate Judge Timothy Rice in early 2009."

119.    The article continues that "Still, when Hausfeld was expelled from Cohen Milstein, he says the plan to open a new firm unfolded quickly for a number of reasons. Hausfeld knew he wanted to continue practicing and continue his push for private enforcement outside the US. But it was also a point in time when various high-profile lawyers, including Dickie Scruggs and others, had been indicted for misconduct. Hausfeld felt it was crucial to let clients and other lawyers know immediately that his fate at Cohen Milstein had nothing to do with such impropriety or anything of the sort. 'There was clearly a sense within the bar that there may be a cloud in regard to why my departure was so swift,' Hausfeld says. 'So we had to instantly respond.'"

120.    The article continues that "Suffice to say, Hausfeld's vision of follow-on, classwide antitrust lawsuits in Europe hasn't panned out the way he and other plaintiff lawyers once believed it would. 'There,' he says, 'I guess the vision has always outrun the reality.' One of the more notable setbacks came in November 2010, when the UK's court of appeals shot down the firm's attempt to certify a class of claimants that had sued British Airways for its alleged involvement in the air cargo price-fixing cartel. A week before the Court of Appeals' decision, the European Commission fined BA and 10 other airlines nearly €800 million for their roles in the cartel. Still, the claimants couldn't come up with the evidence the court required to prove the class had all suffered similar injuries, and Lord Justice Mummery ruled that the attempt at a US-style class action against BA was 'fatally flawed' from the outset."

121.    The article continues that "So it has gone for collective redress and follow-on antitrust litigation in the UK and throughout Europe. The whole process has been frustrating, Hausfeld says."

122.    The article continues that "What's more, Hausfeld says that even after a year of

COMPLAINT

consultations, [foreign governmental antitrust enforcer] DG Comp has declined to contact him or other claimant-only law firms on how best to reconcile those opposing forces at work in European private antitrust litigation. 'We sent letters to them saying: How can you do this? You say you are consulting with practitioners, but you're not consulting with claimant-only practitioners,'" he says. 'You're talking to the major transaction firms, and they have a conflict.'"

123.   The article continues that "This is, for the moment, where Hausfeld's European experiment stands. The firm's London office has also undergone significant changes since he took it over from Cohen Milstein. The two original partners in the office have left the firm: former UK Competition Commission member Rob Murray moved to Crowell & Moring, while Vincent Smith, a former OFT official, left last year to form the Sheppard & Smith competition boutique."

**Defendants' Pattern and Practice of Unethical Behavior**

**Billing Issues**

124.   One of the initial drives was a constant obsession and discussion of how to generate "more lodestar" in cases, meaning, more legal fees. These discussions were not tied to anything other than noting that other plaintiffs' firms in the same cases had more "lodestar."

125.   Plaintiff was specifically told by a firm partner that this partner was instructed by Defendant Hausfeld to create false billing records for two attorneys in the *Air Passengers* litigation that had left the firm. This case was particularly important because it was one of the few cases of any significance that settled in the firm's first few years of operation. This partner complied with Mr. Hausfeld's directive.

**Defendants' Client Solicitation Enterprise**

126.   Plaintiff became aware that Defendant Michael Hausfeld was involved in multiple enterprises, crossing both state-lines, and international lines, specifically organized to, put it frankly, troll for clients. These enterprises appear to violate the client solicitation rules of virtually every

State in the country, and likely those of numerous international jurisdictions as well.  Moreover, those clients were severely misled as to what they were getting into.

127.   Both Mr. Lehmann and Mr. Lebsock would make repeated references to, who for pleading purposes, will be referred to herein as "East Coast Attorney A."  They repeatedly stated "I don't want to know" and "I don't see anything, I don't hear anything" with a smile when Plaintiff would raise questions about East Coast Attorney A's activities with Defendant Michael Hausfeld and the Hausfeld firm.

128.   East Coast Attorney A's efforts were at the direction of Defendants at all times.  At an all-attorney meeting early in the firm's history, which brought together attorneys from all over the firm's U.S. and London offices, Defendant Michael Hausfeld told a roomful of at least a dozen attorneys that "[East Coast Attorney A] is the most important person to this firm."  Plaintiff was present in the room at this meeting.

129.   East Coast Attorney A's letters to clients often copied Defendants, or were soon forwarded to defendants.  A frequent form, appearing to be from a template, would typically begin with: "In accordance with our recent conference pertaining to this firm's registration and handling (together with other class action counsel) of that certain civil refund claim that your company has in the above matter, we hereby agree to register and file same immediately . . ."

130.   The letters would also typically contain this provision: "Your company's obligation will only be and you agree to and shall provide reasonable assistance to our firms and/or the Court in locating and copying individual photocopies of your purchase invoices, which are obviously necessary to prove your company's damages."  This representation is patently, and flagrantly, false.

131.   Letters also frequently made reference to East Coast Attorney A's referral fee of 10% of fees obtained by Defendants.  For example, one letter stated "I am confirming hereby a 10% forwarding fee obligation but, I don't need any return letter in view of the several decades of

COMPLAINT

relationship between [East Coast Attorney A] . . . and Mike Hausfeld."

132.    On information and belief, fees at times were paid to him in advance of any resolution of the case.

133.    East Coast Attorney A's activities resulted in at least one client withdrawing from a case that Plaintiff was involved in.  Plaintiff then fully realized the nature of the enterprise with which Defendants were involved.  The withdrawal caused a potentially very severe problem with the case.  Plaintiff and another firm attorney specifically looked at California's ethical rules regarding client solicitation in Plaintiff's office.  Plaintiff specifically discussed the problem with Michael Lehmann, as Mr. Lehmann was the primary attorney on the case.  In particular, Plaintiff and Michael Lehmann discussed the issue of East Coast Attorney A.  Mr. Lehmann said that East Coast Attorney A and Michael Hausfeld "go way back" and "leave it alone."

134.    Additionally, Plaintiff became aware that Defendant Hausfeld and the firm were involved with an entity believed to be called "Class Action Refund."  Members of that organization called Plaintiff on multiple occasions out of the blue, stating that they were working with a partner in the Hausfeld firm's D.C. office, who they named, and they were calling or contacting potential clients around the world at the direction of that attorney.  Plaintiff followed up with emails to the Hausfeld attorney, seeking to understanding who these people were and what they were doing.

**Defendants' Telephone Practices**

135.    Defendant Michael Hausfeld further had a wide-spread practice, extending across state lines, of having other attorneys surreptitiously listen in to his phone calls with others, including defense attorneys, without those parties being announced and in which the party on the line clearly had an expectation of privacy.  For example, Plaintiff was in the Washington D.C. office and personally observed this.  In one striking memory, Defendant Hausfeld was flapping his arms, summoning multiple attorneys from the east coast offices over to his corner of the firm, with his

COMPLAINT

assistant saying "pick up the extensions, pick up the extensions!" with a defense attorney on the line with whom Mr. Hausfeld was having confidential settlement discussions.

136.     Additionally, Plaintiff was on multiple occasions called in California by Defendant Hausfeld's assistant who would say "Michael wants you to listen and not announce yourself" and then conference him in to a call with a California defense attorney.

**Defendants' Relationship with Citibank**

137.     Citibank is the firm's lender for the United States and London offices.  There was a large internal push to have all settlement funds in cases steered to escrow accounts controlled by Citibank, because that would forestall Citibank from pressuring Defendant Hausfeld on loan repayment issues.  Internal emails that Plaintiff has seen discuss this.

138.     Nothing was disclosed to clients, class members, courts, or co-counsel regarding the firm's critical relationship with Citibank.

139.     Additionally, all possible plaintiffs' litigation expense funds, collected from sometimes dozens of other law firms, would be placed at Citibank.

140.     Citibank is a defendant in at least three separate litigations being pursued by the Hausfeld firm, raising a myriad of conflict of interest concerns regarding suing a company on which the law firm is entirely dependent for its very existence.

**Defendants' "Free-Riding" on Litigation Funds**

141.     Plaintiff became aware that Defendant Michael Hausfeld, in at least two cases, including the *NCAA* Litigation, created shared litigation funds which would fund common expenses incurred by plaintiffs' counsel in a particular case.  This is normal, and in fact expected of firms that are appointed lead counsel in a class action.  What was unusual is that, because of the firm's monetary problems, Defendant Hausfeld specifically ordered that the firm not itself pay into certain of those funds.  He stated repeatedly, including to Plaintiff, that other firms were not to be told about

COMPLAINT

this. He justified it on a novel basis, stating that he "created the opportunity" for the other firms and therefore should not have to pay.

142. In the month before Plaintiff's termination, this ruse threatened to be exposed when the firm's interim co-lead counsel in the *NCAA* Litigation, the firm of Hagens Berman Sobol Shapiro LLP, made inquiries to the firm about proposing to the Court that the firms' interim co-lead counsel status be changed to a permanent appointment. Defendant Hausfeld discussed internally with Plaintiff and at least one other attorney that the firm would propose to Hagens Berman that Hagens Berman pay into the fund, but that the Hausfeld firm had to be very careful in how this was raised so as to conceal the fact that the Hausfeld firm itself had never paid into the fund. Internal emails that Plaintiff has seen reference this issue.

143. The other similar matter that was referenced in which this same situation was occurring is captioned *In re: Fresh and Process Potatoes Antitrust Litigation*, Case No. 4:10-MD-2186-BLW (U.S. District Court, District of Idaho).

## THE ROLES OF MIKE LEHMANN AND CHRIS LEBSOCK

144. A few words are necessary to understand the motivations for Mike Lehmann's and Chris Lebsock's complicity in Defendants' actions detailed herein. One necessary word is: money. Their ethics and judgment became severely eroded and compromised over time. Plaintiff worked with Mr. Lehmann nearly every work day for 12 years at three firms. Plaintiff similarly worked with Mr. Lebsock in close proximity for at least 8 years, also at three firms. Plaintiff observed both of them change significantly in that time, in two principal respects: (1) each became significantly more concerned and vocal about personal monetary issues, as their combinations of bonuses and pay were nowhere near to that which they believed they were entitled to and needed; (2) their ethics appreciably changed for the worse, as they seemed to internalize Defendant Hausfeld's approach to matters.

COMPLAINT

145.    These allegations bolster the plausibility of Plaintiff's contentions and will be proven in this case.

**Michael Lehmann**

146.    Michael Lehmann is a member of various of Defendant Hausfeld LLP's management committees.  His financial needs, desires and habits continued compromised his ethical choices, and made him dangerously beholden to Defendant Michael Hausfeld.

147.    Plaintiff had worked with Mr. Lehmann nearly every day for 12 years.  When Plaintiff started at The Furth Firm in 2000, Mr. Lehmann received a bonus of approximately $1,000,000 that year because of a combination of a very successful case being resolved, and the departure of a dozen or more attorneys from the firm, leaving far fewer members of the firm for which bonuses would be dispersed.  He immediately ramped up his lifestyle, purchasing a home in early 2001 for $1.4 million.  For a combination of reasons, no bonus ever remotely approached that level again.

148.    In recent years, Mr. Lehmann left The Furth Firm in mid-2007, thus obtaining no bonuses which were always paid at year end, to join Defendant Michael Hausfeld at Cohen Milstein.  As discussed herein, that firm was in temporary financial distress due in part to the actions of Defendant Hausfeld.  No bonuses were paid in 2007.  In 2008, Mr. Hausfeld and Mr. Lehmann were terminated, thus Mr. Lehmann received no bonus.  In 2009, 2010, 2011, and 2012, the Hausfeld firm did not pay any bonuses.

149.    Mr. Lehmann's situation became so desperate that at one point he needed to obtain, and did obtain, a $25,000 personal loan from the firm.  This was a topic of much discussion among partners, including issues about the approval process for such a loan, which appeared to have been pushed through by Defendant Michael Hausfeld with no prior discussion with the firm's partnership.  Mr. Lehmann also frequently griped about how when times were good he had created a charitable foundation, called the "Lehmann and Quirk Family Foundation" that he was unable to access,

COMPLAINT

apparently having something to do with the rules governing charitable trusts.

150.    Mr. Lehmann also has a truly unusual on-line shopping habit.  From August 2007, until the time of Plaintiff's firing, publicly available records on eBay show that he has purchased from eBay alone more than 400 items, generally extremely expensive watches and other high-end luxury items.  It was a long-running source of amazement among office personnel at his various firms how often packages would show up for Mr. Lehmann including from unusual locales.

151.    Mr. Lehmann also while at Hausfeld engaged in other instructive behavior.  For example, when the firm was going through layoffs due to the firm's financial distress, Mr. Lehmann decided that the San Francisco office would layoff its only two support staff, a secretary and a paralegal, and that this would be a show of "belt-tightening" that would set the San Francisco apart in terms of its financial sacrifices, and impress Mr. Hausfeld.  The secretary, an older woman, had recently sustained a massive fracture of her leg falling down some stairs at home.  She was in John Muir Hospital in Walnut Creek.  Mr. Lehmann wanted Plaintiff and Mr. Lebsock to call her in the hospital and tell her she was laid-off and no longer had a job.  A support staff member literally yelled at Mr. Lehmann in Plaintiff's office about how unbelievably callous he was being towards an employee.  Mr. Lehmann would not back down.  He ordered Mr. Lebsock to proceed as planned.  For other reasons, the layoffs were delayed for a week.  The secretary returned to her home, and reported that she was on significant painkillers and not doing well.  Mr. Lehmann again ordered Mr. Lebsock to call her and tell her she was laid off and no longer had a job.  Plaintiff sat and watched Mr. Lebsock call the woman and tell her she was laid off.  "I feel terrible," Mr. Lebsock told her.  "I feel terrified," she responded.

**Chris Lebsock**

152.    Chris Lebsock is Defendant Hausfeld LLP's "San Francisco Administrative Partner."  Plaintiff was requested by Mr. Lebsock to actually help him craft the job description for this position,

COMPLAINT

and its primary purpose is to serve as the point of contact between the San Francisco and Washington D.C. offices. His financial needs, desires and habits continued compromised his ethical choices, and made him dangerously beholden to Defendant Michael Hausfeld.

153. Mr. Lebsock was incensed, when the firm made its initial allocation of partnership points, that he was near the bottom of the list, including being allocated less of an ownership interest than attorneys in the Washington, D.C. office that had significantly fewer years in practice than did he. Mr. Lebsock discussed this with Plaintiff numerous times, and Plaintiff was with Mr. Lebsock on occasions when he complained to Mr. Lehmann about it, and also witnessed Mr. Lebsock interrupt Defendant Hausfeld's preparations for an initial hearing in the *NCAA* Litigation to discuss his unhappiness with the allocation of partnership points.

154. One or more subsequent iterations of the allocations in subsequent years still were not to Mr. Lebsock's satisfaction. Mr. Lebsock stumbled in trying to handle certain cases "on his own" at the firm, such as an ongoing one captioned *O'Neill v. Honeywell* that has turned into a debacle of the highest order, including Mr. Lebsock apparently inadvertently waiving the right to a jury trial, and then settling the case for a tiny amount to be split among something like ten people, then facing conflict of interest problems about how that money would be divided between disagreeing groups, then failing to get an actual settlement agreement signed by the defendants, leading to a possible re-opening of the case. There were several other instances of Mr. Lebsock "getting over his head" in trying to carve out a distinct niche at the firm.

155. In another case, Mr. Lebsock was forced to settle a case close to trial when he literally could not get any expert witness to testify in favor of Mr. Lebsock's view of the case. Plaintiff recalls Mr. Lebsock walking in to his office with a Wikipedia printout that literally in the first few sentences detailed the immutable principle against Mr. Lebsock's theory, and realizing he had to settle the case.

COMPLAINT

156.    Mr. Lebsock also made a very public display in the San Francisco office that he had transferred all of his assets into a family member's name so that the firm's lender Citibank would, in his mind, never be able to seek recourse from that collateral.  He would many, many times giddily say "I'm a pauper on paper!"  When it was pointed out to him that, even if he somehow was correct that Citibank could not reach his assets if needed, Citibank would no doubt turn to his partners including Michael Hausfeld to make up any discrepancy, Mr. Lebsock would just shrug.

157.    Mr. Lebsock for several years lamented his inability to put a second story on his Mill Valley, Marin County, California home due to massive expenses.  Within the last year, he finally went forward.  A simple internet Google search immediately turns up hundreds of pages in various files from this year including numerous public comments from several dozen neighbors opposing what they term a "McMansion."  Some of the public comments refer to intimidation by Mr. Lebsock, and they also have made public emails Mr. Lebsock sent from his Hausfeld firm email account.  There also is posted on-line a letter from Mr. Lebsock that has noted the big expense of this public battle with all of the neighbors, and the numerous sets of architectural and engineering plans that have had to be repeatedly revised and resubmitted to the relevant governmental authorities.

158.    To raise his profile within the firm, an improve his financial possibilities, Mr. Lebsock seized upon the solution of working with Asian clients after he received the "cold-call" email from a Korean attorney discussed herein.

**Defendants' Actions Towards the Zelle Hofmann Firm**

159.    Things began to get even more strange when it came to dealings relating to the Zelle Hofmann firm.  This is the firm which was extremely generous to the Hausfeld firm, since its formation.  To this day, the Zelle Hofmann firm allows the Hausfeld firm's San Francisco office to literally be embedded within the Zelle office, and this arrangement commenced immediately upon the firing of Michael Hausfeld by his old firm, meaning the same day, sharing office space, supplies,

COMPLAINT

virtually everything that was needed.  There is no segregated area for the Hausfeld firm, and the individual offices literally are intermixed within the footprint of Zelle's space, including directly next to Plaintiff's office, as well as directly next to Mr. Lebsock's office, and within a few feet of Mr. Lehmann's office.  At times, the Hausfeld firm because of its financial problem would become severely in arrears in making rent payments, which were on very generous terms to begin with.  The Zelle firm personnel are extremely gracious and professional hosts.

160.   The first oddity arose with respect to the Hausfeld firm's efforts to recruit as a client in China the massive China National Offshore Oil Company ("CNOOC") in a matter known as the Marine Hoses Antitrust case.  The Zelle firm already had been working towards a relationship with that entity and been engaged in efforts for a year or more.  Chris Lebsock entered Plaintiff's office, stating in very hushed tones that "we're trying to get CNOOC" and "don't tell Zelle or anyone" and went on about how this was "secret" and the firm was using a "consultant" to do so and that "Zelle will be pissed."

**The Principles Against Conflicts of Interest**

161.   The issues discussed below pertain to conflicts of interest.  Rules in every State, including California, governing the conduct of attorneys have prohibitions against conflicts of interest.  To put it simply, an attorney owes his client undivided and total loyalty.  This is a fiduciary duty, and requires an attorney to place clients' interests above the interests of the attorney *at all times*.  This ensures that a client receives the zealous representation and advocacy to which he or she is entitled.  A simple example is to picture a client that has retained an attorney to sue a company.  If that attorney at the very same time was secretly doing work *for* the very company that he had just sued, one can easily imagine the problem.  The attorney's loyalties would be so compromised, or at a minimum appear to be so compromised, that the attorney would violate his professional responsibilities by maintaining such a situation.  And keeping the situation a secret only further

COMPLAINT

compounds the appearance of impropriety.

162.    Conflicts of interest are particularly problematic in class action cases, because even in the unlikely event that, after fully informed decision-making, the named plaintiffs (also known as "class representatives") and defendant companies waive any possible conflict, they cannot waive any conflict on behalf of the thousands of class members.  Chris Lebsock, in fact, specifically authored a memorandum at the firm on this very topic, as did another partner.  The memorandums reflected the heightened prohibitions against conflicts of interest in class action matters when there is even the *appearance* of a conflict, because the thousands of class members can never be effectively consulted to weigh-in on what each of them thinks about the situation.

**The Asian Electronics Manufacturer Cases**

163.    Next, and far more troubling, Mr. Lebsock stated to Plaintiff one day, again in hushed tones after walking in and closing Plaintiff's door, that "We're meeting with [Asian Electronics Manufacturer 1] and [Asian Electronics Manufacturer 2]"  These entities are among the most notorious price-fixers in the world, having sustained staggering criminal convictions and fines, and were defendants in numerous lawsuits brought by Defendant Hausfeld LLP and others regarding numerous products.  Plaintiff presumed this meant in those cases, and stated words to the effect of "For what [naming the shorthand for the largest of the cases]?"  No, said Mr. Lebsock.  "For Air Cargo."  This meant the Air Cargo price-fixing litigation, pending in New York and in London, in which, as Mr. Lebsock explained, those entities could be *plaintiffs* in foreign cases, specifically, Mr. Lebsock stated, in London through the firm's London office.

164.    Mr. Lebsock stressed to not tell anyone because there were "conflict issues" and that it would "freak out" the firms in charge of the cases in the U.S. in which these Asian entities were defendants.  Indeed, the very products for which the Asian entities would have been purportedly overcharged by airlines were the ones that the Asian entities have themselves illegally fixed the

COMPLAINT

prices on. The firms in charge of the U.S. cases included the Zelle Hofmann firm, as well as another one housed in the same building in San Francisco that the Hausfeld firm worked with on numerous cases, including on the *NCAA* Litigation.

165. Plaintiff, upon hearing this plan, stated words to the effect that "That's insane. You literally are talking about the most notorious price-fixers in the world." Plaintiff specifically recalls those statements, including the word "notorious." Mr. Lebsock then recited figures about the massive volume of air cargo traffic engaged in by the Asian companies, stated "This could huge" and left with an odd smile, but not before again stating in a hushed tone "Don't mention this to Zelle." It was such an unlikely scenario, that Plaintiff was not entirely certain if Mr. Lebsock was joking, or more likely misinterpreting something about meetings that would never happen.

166. However, shortly thereafter, Mr. Lehmann summoned Plaintiff to his office, where Mr. Lebsock was sitting. They were examining and discussing facts and figures about these two Asian companies and the same matter that Mr. Lebsock had discussed. Mr. Lehmann repeated in essence what Mr. Lebsock had stated, and was already talking about how the matter could conceivably be staffed, and logistics on what would be sure to be a massive amount of those companies' electronic data about shipping, how that data could be reviewed, and who could travel to Asia to assist with this project.

167. Mr. Lehmann several times made a point to say "Don't tell [using name of the attorney in the firm's building that was running one of the main cases against the Asian companies]. He will go crazy." Both Mr. Lehmann and Lebsock repeatedly stressed that the Hausfeld firm was awaiting decisions from that attorney's firm and another on what was expected to be a legal fee of 4 or 5 million dollars in one of the principal cases against the Asian manufacturers for their price-fixing. Mr. Lehmann and Mr. Lebsock repeatedly stressed that any disclosure of representing the Asian companies or doing anything to assist them would cause a conflict of interest not only for the

COMPLAINT

Hausfeld firm, but could conceivably be imputed to the firm's co-counsel, thus throwing the entire case in disarray and burning bridges in a catastrophic way with literally dozens of law firms involved in the cases.

168.    Both Mr. Lehmann and Mr. Lebsock continued to work extensively on the cases *against* the Asian Electronics Manufacturers.

169.    Mr. Lehmann and Mr. Lebsock went so far as to question Plaintiff on his availability for staffing these new matters with respect to the Asian Manufacturers.  Plaintiff repeated words to the effect as to what he had told Mr. Lebsock separately, that this whole thing sounded "crazy."

170.    Plaintiff specifically asked the obvious question, "What does Michael [meaning Michael Hausfeld] think about all this?"  Mr. Lehmann stated "He wants to do it" and further stated that "He thinks we can run everything through the London office" and "We can keep it confidential" and "it would never be disclosed to [naming the two firms in charge of the fees expected be received]."

171.    Mr. Lehmann further stated that the legal fees could dwarf the legal fees that were expected in one of the pending cases, and could make those legal fees "look like chump change." Mr. Lehmann further stated that "We might make so much money here that we'll never have to give a shit again what [naming an attorney in charge of the principal case against the Asian Manufacturers] thinks."

172.    Sufficiently concerned, Plaintiff asked what was the origin of this entire situation. Mr. Lebsock explained that he had received a unsolicited cold-call type of email from an attorney in Korea named Young-ki Rhee, who had wanted to work with the firm on cases of mutual interest. This attorney seemed to be getting some quasi-class or mass-actions together in Korea.  Mr. Lebsock had emailed with him, and eventually communicated by phone.  This Korean attorney in turn had connections with a larger Korean defense firm attorney, identified to Plaintiff as "Chairman Lee"

COMPLAINT

who in turn had relevant connections with the two Asian companies.

173.     The meeting with Plaintiff, Mr. Lehmann and Mr. Lebsock concluded with yet another reminder that no other firm was to hear anything about this, in particular the Zelle firm and the two firms leading the case in which the Hausfeld firm was involved.

174.     Over the next several weeks at least, Messrs. Lebsock and Lehmann would periodically make reference to the situation. Plaintiff asked them at one point whether anyone had done a "conflicts analysis" on the situation. Mr. Lehmann shrugged his shoulders and said "You know Michael [meaning Hausfeld.] He thinks he can settle the case quickly."

175.     The next news from Mr. Lebsock and Lehmann was that they were going to meet with an in-house attorney from one of the Asian companies who was going to be in San Francisco. They made arrangements to do so in connection with a visit from Michael Hausfeld to the San Francisco office. Mr. Hausfeld never travels without a pre-typed itinerary from his secretary, and it likely memorializes the meeting. The three and one other firm representative with the representative of the Asian company in San Francisco, a female attorney.

176.     Mr. Lebsock stated to Plaintiff that the meeting went well, and then something even more alarming, in his customary hushed tones in Plaintiff's office, which was flanked on two sides by Zelle personnel. Not only had he, Mr. Lehmann and Mr. Hausfeld discussed the Air Cargo matter, but that they told the Asian company's counsel that they shared offices with the Zelle firm, that was lead counsel on behalf of plaintiffs in several cases against the company, and that the Hausfeld firm would agree to surreptitiously monitor the Zelle firm and work to provide information on what the Zelle firm had in mind as far as possible settlement ranges and the direction of the litigation. Mr. Lebsock stressed that this was absolutely confidential, and that the Zelle firm was obviously not to hear about this. Plaintiff responded that "[Using the lead attorneys name] is two offices down the hall [pointing right over there]. Are you crazy? We are in their law firm."

COMPLAINT

177.    On another occasion, Mr. Lebscok brought a man he identified as "Chairman Lee" to the San Francisco office, and introduced him to Plaintiff.  Visitor logs and emails to the building security and the Zelle Hofmann firm memorialize this visit.  Additionally, on at least one occasion, both Defendant Hausfeld and Mr. Lebsock travelled to New York to meet with Chairman Lee.  Mr. Lebsock specifically stated that this was a very important, "Chairman to Chairman meeting," referring to Mr. Hausfeld's actual title of Chairman of Hausfeld LLP (reflected, for example, on the firm's website at:  http://www.hausfeldllp.com/pages/lawyers/michael_hausfeld ) that Mr. Hausfeld was prone to use on certain occasions.

178.    On another occasion, Mr. Lebsock set up a breakfast meeting at an Oakland restaurant with "Chairman Lee" and urged Plaintiff to go.  Plaintiff declined.

179.    Mr. Lebsock subsequently took multiple trips to Asia, including to meet with representatives of the Asian Companies, and Young-ki Rhee and "Chairman Lee."  Last year, in 2012, Mr. Lehmann did as well on at least one occasion. Mr. Lebsock also spoke of being in Asia with Mr. Hausfeld on at least one occasion in the last year, and shared an account of the two participating in an evening social event while there with their hosts.  Mr. Hausfeld also had a recent trip planned in the months just before Plaintiff's firing.  It appeared to be temporarily postponed because of scheduling complications, and Plaintiff is presently uncertain if it ultimately occurred.  A partner from the London office also accompanied them on these Asia trips.

180.    Mr. Lebsock and Mr. Lehmann both eventually stated to Plaintiff that the firm had in fact reached some sort of agreement to assist the companies, and that the retention was going to be "routed" through the London office somehow to "avoid any problems" and that it could be a "huge case," and any successful legal fees would somehow get back to the U.S. firm.  Once again, they stressed the total secrecy of whatever was going on.  They then detailed some ill-conceived plan about how perhaps the firm could even "get their patent and IP work" as the firm had recently hired

COMPLAINT

its first-ever patent attorney.

181.    Mr. Lebsock and Mr. Lehmann stated that in order to get both of the Asian Electronics Manufacturers involved in Defendants' schemes, both of those companies had wanted to be sure that the other company would do it.  Defendants' facilitated this communication.  This is particularly notable given that those companies' many legal problems had to do with their unlawful coordination with each other and other companies on pricing issues.  When explaining this, both Mr. Lebsock and Mr. Lehmann chuckled at the obvious irony of these Asian companies being concerned about coordinating with each other.

182.    Plaintiff repeatedly told Mr. Lebsock words to the effect that that "this is trouble" and that "you've gotten way over your head," and that "You've got to get the firm out of this."  He would simply smile and say "Michael [meaning Hausfeld] is on board" and then launch into a discussion about how much money it could bring the firm based on the statistics he would then cite about freight traffic for those companies.

183.    The firm has multiple ongoing cases to this day in which those Asian manufacturers are defendants.

184.    The Asian law firms have made requests to the firm for an up-front payment.

185.    There is copious information corroborative of this situation on the firm's computer and email system, including emails, memorandums, trip reports, expense reports, and itineraries.

186.    Plaintiff would frequently observe Mr. Lebsock in particular discussing the Asian Electronics cases with Zelle Hofmann attorneys, seeking to gain information on the status of the matter and settlement discussions.

**DEFENDANTS PRESSURE PLAINTIFF**

187.    The situation continued to deteriorate, and progress towards Plaintiff's firing.  Messrs. Lehmann and Lebsock, eventually realizing they were not going to persuade plaintiff verbally that

COMPLAINT

things were ok, adopted a different tactic.  For lack of a better word, they appeared hell-bent on either trying to "infect" Plaintiff and get him intimately involved in matters involving the Asian Manufacturers, or to lay the groundwork to have him fired.

188.   Plaintiff continued to resist working on the matters, out of disgust for what was occurring, and the numerous subterfuges going on, including regarding numerous of the co-counsel that Plaintiff was directly working with in the *NCAA* Litigation.

189.   And in a practical sense, the demands of the *NCAA* Litigation were virtually all consuming.  Plaintiff felt, and still does feel, a tremendous sense of loyalty to all of the inspirational clients, the many excellent co-counsel in the case, and to the case consultants Sonny and Pam Vaccaro, the ones that gave a voice to the issue.  Numerous individuals will testify that were it not for Plaintiff's loyalties in the *NCAA* litigation, and sense of obligation to it, he would have left the firm long ago due to its extreme dysfunction.

**The Lehmann Emails and Meeting**

190.   The situation continued to deteriorate, and progress towards Plaintiff's firing.  In late May, Mr. Lehmann and Mr. Lebsock had convened a meeting with Plaintiff, asking him to work on another discrete cases in which the Asian Electronics Manufacturers were again primary defendants, including to analyze confidential documents produced by the defendants on behalf of plaintiff and class members.  Mr. Lehmann circulated back several times in subsequent days, wanting to discuss the case and to get Plaintiff involved in it.  Mr. Lehmann also repeatedly indicated that he wanted Plaintiff to greatly eliminate if not cease altogether work on the *NCAA* litigation.

191.   On June 11, 2012, Mr. Lehmann emailed Plaintiff, writing that "what's your schedule in terms of review of [another Asian electronics case] documents?"  Plaintiff resisted by email, indicating with specificity the numerous obligations of the NCAA case.  Mr. Lehmann wrote later that day "On NCAA, participate in fewer calls, attend fewer meetings, let others worry about court

filings and do fewer depositions.  There are plenty of people working on that case . . ." and further

stating that "you have to follow through" and "work on [the Asian electronics case]" Mr. Lehmann

later insisted by email that "Rather than debate this any further by email, let's you, I and Chris have

an in-person meeting tomorrow at 10 am."

192.    The situation continued to progress, with Plaintiff requesting in writing, to Mr.

Lehmann, intervention by Human Resources.  As noted herein, Mr. Lehmann is a member of

numerous firm management committees.  Plaintiff responded to Mr. Lehmann's request stating at

4:12 p.m., writing that "I formally request that an HR person listen in as I have certain concerns to

discuss."  Mr. Lehmann knew exactly what that meant, as the matters had previously been

specifically reported to him and Mr. Lebsock on numerous occasions.

193.    Additionally, Plaintiff wrote, regarding the NCAA case, "You may recall that we've

had [firm attorneys] Megan, Steig, Hilary, Art come and go on the case . . . an numerous co-counsel

come and go . . . I don't know how to reconcile your statements with serving the case, clients and

Michael's vision for the remainder of the case and beyond . . . [Your emails] imply it's optional to

try to ensure continuity so we are not embarrassed . . . whatever anger you have about the [NCAA]

case is between you and Michael."

194.    Mr. Lehmann wrote back only "We need to have a meeting tomorrow at 10 am and

you will be expected to attend."  The next day, Plaintiff attended the meeting as ordered.  Only Mr.

Lehmann and Mr. Lebsock were present in Mr. Lehmann's office.  No human resources personnel

were present or made available on the phone as Plaintiff had requested in writing.  Mr. Lehmann

stated that he wanted Plaintiff to visit another law firm to learn how the database worked.  Plaintiff

believed Mr. Lehmann and Mr. Lebsock were prepared to, as members of numerous firm

management committees, fire him on the spot if he did not comply.  Plaintiff visited the other law

firm that day or the next day, received some basic handouts on how the database would work, and for

COMPLAINT

other reasons, the project was cancelled on or about that same day with no documents being reviewed, preventing the issue from coming to a head.

**The Lebsock Email and Meeting**

195.    The situation continued to deteriorate, and progress towards Plaintiff's firing.  In early September 2012, the day after the Santa Clara University Sports Law Seminar, having returned from an approximately ten day vacation, Chris Lebsock, the San Francisco Administrative Partner, emailed Plaintiff, stating that "We really need you to come into the office more," that he wanted to "cross-pollinate" on matters, and that Plaintiff's attendance would "improve morale" in the San Francisco office.  Notably, Plaintiff was in fact in the office when Mr. Lebsock sent the email.  Mr. Lebsock frequently believed Plaintiff was not in the office, and many visitors would stop by Plaintiff's office, telling them that Mr. Lebsock just said Plaintiff wasn't in the office.

196.    Plaintiff immediately also went down the hall and had a heated discussion with Mr. Lebsock.  Plaintiff reiterated that it was totally inappropriate for Mr. Lebsock to send an email like that, and that he knew exactly why Plaintiff was not interested in working with him, and that it was extremely upsetting that after many years of working together Mr. Lebsock was now behaving like this.  Mr. Lebsock said nothing in response, and did not refute a single statement that Plaintiff made to him.

197.    Plaintiff followed-up with an email to Mr. Lebsock, asking for a retraction of Mr. Lebsock's email, and that anyone to whom Mr. Lebsock relayed incorrect information should be apprised of corrective information.

198.    Plaintiff further specifically referenced in his email no desire to "cross-pollinate" with Mr. Lebsock, specifically referencing the conflicts of interest issue, and "other things I'd rather not put in writing."

199.    Notably, Mr. Lebsock never responded, and never asked what the "conflicts"

reference meant, and never asked what Plaintiff meant by the "other things I'd rather not put in writing," because he knew precisely what was referred to there, the matters discussed herein including his surveillance of the Zelle firm and the activities of East Coast Attorney A.

200.    Mr. Lebsock never communicated with Plaintiff again, either verbally or in writing prior to Defendants firing Plaintiff.

**The Tom McMillen Issue**

201.    The situation continued to deteriorate and progress towards Plaintiff's firing as Plaintiff became aware of, and raised, conflict of interest issues relating to the *NCAA* Litigation.  In September, a junior associate on the case informed Plaintiff that Defendant Michael Hausfeld had met to discuss the *NCAA* Litigation with Tom McMillen, a former member of the U.S. House of Representatives, and former professional and collegiate basketball player.  The associate mentioned that Mr. McMillen was now a member of the University of Maryland system's Board of Regents, and that he and Mr. Hausfeld were planning to set up another discussion.  Plaintiff immediately pointed out that there were several problematic ethical issues, given that Maryland obviously is a prominent member of the NCAA, including conducting communications with a party whose interests were being represented by defense counsel, and conflict of interest issues.  The associate indicated that the associate shared the concerns.  Emails memorialize discussion on this.  They agreed to put it on the agenda for the next case team call, which includes the firm's internal case team staff and certain co-counsel from other firms.

**The Venable LLP Issue**

202.    In the course of the discussion, the associate mentioned that also the law firm of Venable LLP represented the University of Maryland system.  This was even more alarming, given that the Venable firm was working at times extensively on the *NCAA* Litigation, as well as on the related "FCAA" plan discussed herein.  The firm in fact had been sending numerous invoices to the

firm for several years, memorializing its work on the "FCAA" plan, as well as billing significant time on the NCAA case. Plaintiff had never heard anything about Venable's representation of an NCAA member.

203.    Plaintiff informed the associate that such an issue had specifically caused the firm to deny another prominent firm entrance to the case prior to the filing of the case in 2009. Emails on this firm's system, as well as at least two other law firms' systems, document that situation.

204.    Plaintiff further pointed out, as he had done many time previously in the case, that in prior analogous class action settlements by the NCAA, the NCAA simply taps its members to pay the settlements, because the members *are* the NCAA.

205.    Plaintiff and the associate agreed that in addition to the Tom McMillen situation, the Venable situation should be added to the case team meeting agenda as well, and the associate did so and it is memorialized in emails circulating the agenda.

206.    That week, or the next week, in mid-September, the case team call occurred. At the end of the meeting, the associate raised the topic. Plaintiff also briefly recapped the situation and mentioned there were conflict of interest issues. Defendant Michael Hausfeld cut him off, literally said "I don't care" and then said he had to end the call to tend to other things. The call abruptly ended.

207.    Plaintiff subsequently has recently learned as well that the Venable firm also appears to have been performing work for Mr. Hausfeld in another matter which appears to be a conflicted representation.

208.    Of note, prior to the filing of the initial *O'Bannon* complaint, the firm considered adding a very prominent, nationally-known firm generally known for defense matters as co-counsel. The firm expressed interest in joining the case, but noted that certain of its partners had represented the University of California's Board of Directors in certain matters. Defendant Hausfeld specifically

considered and declined to go any further, noting that it would pose a conflict of interest that could not be waived in a class-action, and further would by imputed to Defendant Hausfeld. These analyses and communications are specifically memorialized in emails on Defendant Hausfeld's computer system.

209.    On another occasion, without the knowledge of Plaintiff, certain partners learned that the Attorney General of Utah had put out a request for proposal for law firms to apply for the right to represent the State of Utah and potentially others against the organizers of the Bowl Championship Series. Those partners made a submission to the Attorney General's office requesting more information. No conflicts check was every submitted to Plaintiff or to all attorneys at the firm.

210.    When Plaintiff learned of this, he pointed out that the Attorney General was seeking to represent aggrieved parties including certain state universities that were NCAA members and were allegedly harmed by the operation of the BCS. Plaintiff pointed out those conflict issues, and further that the AG's office could be subject to public records requests as well, and the firm stopped its efforts. Those emails are memorialized on the firm's computer system.

211.    For example, on March 16, 2012, Jessyca Newman from the State of Utah emailed a firm partner with proposal information for the case, and the firm partner emailed it to Defendant Hausfeld's "New Case Committee" and included Plaintiff. Another firm partner wrote 20 minutes later "I recall that those on the NCAA case viewed this one as a conflict, and one we should not pursue. Jon is that correct?"

212.    It thus was apparent that more than three years into Defendant Hausfeld LLP's existence, it still had not managed to put into place  a consistent conflicts of interest checking system, a fact which Plaintiff found to be absolutely baffling. Plaintiff over the years sent numerous emails asking about the status of conflict of interest checking procedures. At one point, he was told that there were "problems" with the old system, and that a "new system" had to be purchased.

COMPLAINT

213.    Plaintiff believes that the foot-dragging on the system was no accident.  Defendant

Michael Hausfeld stressed numerous times, in numerous ways, to all attorneys at the firm that they

should put as little as possible in writing.  This concern appeared particularly heightened on matters

pertaining to the London office, and began to be adopted by Hausfeld's key U.S. partner in charge of

day to day matters pertaining to London.  For example, at one point in 2012, that partner wrote an

email to all partners referencing legal fees and the London office, and a follow-up stating that no

emails should be sent regarding how the U.S. offices share in legal fees obtained by London.

214.    Numerous other conflicts were ignored by Defendants.  In one example, despite

proclaiming itself as a "global claimants firm" from its inception to this day, as exemplified by

literally the first words in the first sentence of its "Vision Statement" on its website right now,

Defendants jumped at the chance to obtain legal fees *defending* a company in a matter regarding

freight-forwarding price-fixing pending in federal court in New York.  Upon hearing of Defendants'

intention, Plaintiff immediately informed them that he worked directly on this case at The Furth Firm

on the plaintiffs' side, had literally researched and drafted the complaint by himself, worked with the

first plaintiff, and participated in every aspect of the case from its filing and beyond until leaving The

Furth Firm.  Defendants nonetheless undertook the representation, ignoring the concerns.  Internal

emails memorialize the situation.

215.    Other significant conflict issues were ultimately ignored, as further memorialized on

the firm's email system.  In one of the firm's major matters, a prominent co-counsel firm

simultaneously represents a very major third party recipient with extremely close ties to a primary

defendant.  This matter specifically caused Defendants to retract a document preservation letter sent

to that third party, so as to continue to curry favor with the prominent firm and not lose their support

in the critical years of rebuilding his reputation after being fired by his prior law firm.  Numerous

internal emails memorialize this situation.

COMPLAINT

**The Kenneth Feinberg Issue**

216.    Finally, 12 days before Defendants fired Plaintiff, a final conflict of interest issue arose.  Kenneth "Ken" Feinberg is nationally-known attorney specializing in mediation and alternative dispute resolution.  He was been appointed by the federal government to serve as Special Master in several high-profile matters.  On or about September 20, 2012, Plaintiff noticed an article bearing that date on the internet from the Associated Press stating that "Penn State said Thursday that it retained the Washington, D.C. law firm led by Ken Feinberg for what the university described as an effort to resolve all litigation, including claims that have not been filed, by the end of the year."  The article went out to describe that the retention of Mr. Feinberg and his law firm for purposes relating to the horrific Jerry Sandusky sex abuse crimes at Penn State and the resulting apparent cover-up by various individuals at the university.

217.    This article was alarming, as Mr. Hausfeld had previously created an entity under the laws of the District of Columbia called the Former Collegiate Athletes Association ("FCAA"), that he envisioned as being some type of vehicle to resolve the *NCAA* case and to attempt to negotiate licenses with the NCAA, its members, television networks, and video-game manufacturers.  This entity had been discussed with at least one defendant, including Mr. Feinberg's participation, by Mr. Hausfeld, pursuant to court-ordered mediation discussions that failed as has been publically stated in court filings.  Plaintiff additionally observed Mr. Hausfeld invoking Mr. Feinberg's name to numerous others connected with the case.

218.    As of January 14, 2013, the District of Columbia's Department of Consumer and Regulatory Affairs, Corporations Division, lists an entry for the Former College Athletes Association, listed with a date of organization of March 22, 2011.  It lists a "Business Address" as the identical street address and suite number as that of Defendant Hausfeld LLP – 1700 K Street, Suite 650, in Washington, D.C.  This information is publicly available here:

COMPLAINT

<https://corp.dcra.dc.gov/BizEntity.aspx/ViewEntityData?entityId=4103352> (last visited, January 14, 2013).

219. Plaintiff participated in numerous conference calls with Defendant Hausfeld and numerous others regarding the FCAA, including some with Mr. Feinberg. Plaintiff further received and sent numerous emails on the topic. Some of them memorialize conflict of interest concerns and issues, and for good reason. On or about December 16, 2009, Plaintiff travelled in a car with Defendant Hausfeld, Mike Lehmann, Chris Lebsock, and one other firm employee to the South Bay for a meeting with a corporate client relating to an investment fraud case. On the way back to San Francisco after the meeting, the talk turned to the *NCAA* Litigation and the role of the FCAA which was to be formally created. Defendant Michael Hausfeld was asked words to the effect of "What's the plan for the FCAA? Why are we doing this?" Defendant Hausfeld's response was exactly this: "It's a revenue stream for us." Numerous emails on the firm's system memorialize multiple attorneys' concerns and references to potential conflicts of interest. The concerns detail creating a business that Defendants ultimately intended to be a for-profit licensing entity, and using the class action mechanism to obtain that source of ongoing profits for the firm from a business entity.

220. In another matter, Defendant Hausfeld was trying to do the same thing at the time he fired Plaintiff. On a firm partner call within the last month before Plaintiff was terminated, a partner was asked why Michael Hausfeld was trying to create some sort of new entity. Michael Hausfeld was not present for this call. The partner was asked by another partner, "How do we make money out of this?" The other partner's response was exactly this "I don't know, but knowing Michael, he'll find a way." Numerous of the partners on the call from the Washington, D.C. office gave knowing laughs.

221. The relationship was particularly important to Mr. Hausfeld, as Mr. Feinberg had served as mediator in several cases involving Mr. Hausfeld.

222. Mr. Hausfeld had recruited and installed Mr. Feinberg as one of three members of the

COMPLAINT

FCAA's Board of Directors.  Plaintiff attended one or more conference calls with Mr. Hausfeld, Mr. Feinberg and others regarding the FCAA.

223.    Plaintiff emailed the article to Mr. Hausfeld and Mr. Lehmann, noting Mr. Feinberg's representation of Penn State, and his status as an FCAA board member.  Plaintiff received no response or comment.

224.    Defendant Michael Hausfeld fired Plaintiff twelve days later.

**DEFENDANTS FIRE PLAINTIFF**

225.    The day that Defendants fired Plaintiff, Wednesday, October 3, 2012, Plaintiff and Defendant Michael Hausfeld that morning attended in San Francisco a previously scheduled Case Management Conference in the *NCAA* Litigation held before Magistrate Judge Nathanel Cousins. The day before, October 2, 2012, Plaintiff and Defendant Michael Hausfeld prepared together for the court appearance in Plaintiff's office.  Such preparations were normal and customary, and occurred before every court appearance in the case since its filing in 2009.  Defendant Hausfeld asked Plaintiff various questions to prepare for the hearing, had Plaintiff draft a memorandum and research various items.  There was nothing unusual whatsoever about the preparation.

226.    The hearing was not anticipated to be one at which speaking roles would be needed for anyone other than Defendant Michael Hausfeld.  Plaintiff, always being deferential to Defendant Hausfeld, and not wanting to assume anything, asked Defendant Michael Hausfeld "should I come to the hearing?"  The two had earlier discussed various other pressing projects in the case, and it was not clear if Plaintiff's time was best spent on other matters that day.  Defendant Michael Hausfeld, who was walking out of Plaintiff's office at that point, looked back, said "Of course!" with a big smile, and tossed a highlighter to Plaintiff in a friendly fashion.

227.    The next day, Plaintiff and Defendant Michael Hausfeld continued to prepare at the federal courthouse, having both arrived early, along with other case team members.  The preparation

continued in the courtroom as Plaintiff and Defendant Hausfeld both took their customary positions at the front of the counsel table, and waited for the hearing to begin.

228.     The hearing itself was not notable in any way involving Plaintiff. As the transcript reflects, the Magistrate had various questions for Defendant Hausfeld as to whether he had changed his theory of the case, as the NCAA was vehemently contending, and Defendant Hausfeld also made a surprising proclamation to the Magistrate that he would file a motion for summary judgment within a few weeks. That aside, with respect to Plaintiff, it was an entirely routine court appearance. When it was over, the case team discussed plans to immediately return to the Hausfeld firm's office to discuss next steps in the case, and everyone returned to the office.

229.     Plaintiff waited in his office in San Francisco, as various case team attorneys popped in and out, comparing notes and discussing next steps in the case, as everyone waited for Mr. Hausfeld to arrive so the formal meeting could commence.

230.     At approximately noon, Defendant Michael Hausfeld instead walked into Plaintiff's office with a woman Plaintiff had never seen or met before. Hausfeld introduced her as "Kelly Haire, the firm's outside human resources consultant from TPO" [meaning a company called TPO, Inc.]. The firm had several years before eliminated all human resources personnel and outsourced the positions due to lack of funds. It became apparent that she had flown out the previous day from Washington D.C., meaning that the entire process had been set in motion long before Defendant Hausfeld specifically requested Plaintiff to come to court with him.

231.     Defendant Hausfeld stated to Plaintiff that the firm had terminated him. Plaintiff immediately asked "Why?" Ms. Haire was present the entire time, and appeared to be taking notes. Defendant Hausfeld referred to "two incidents" which without question referred to Plaintiff's heated discussions with Mr. Lebsock and Lehmann. Plaintiff asked Defendant Hausfeld to explain what he had heard, as he had never spoken with Plaintiff about the situation and could not have a full

COMPLAINT

understanding.  Plaintiff specifically stated that he was extremely concerned that Defendant Hausfeld had received misleading and incomplete information.  Defendant Hausfeld did not supply any details of his understanding of the situations, and did not ask Plaintiff to supply any information.

232.    The oddity and unexpectedness of this situation was compounded by the fact that it was unclear what sort of privileged or confidential information could or should be discussed in this meeting with Ms. Haire from TPO, Inc.

233.    Plaintiff repeated that it was extremely troubling that Defendant Hausfeld had never asked him for any information, but now it appeared that the matter of Plaintiff's termination had already been decided.  Defendant Hausfeld said "Yes, it's done" and did not ask Plaintiff for any information.

234.    Plaintiff again asked why Defendant Hausfeld would have never spoken to Plaintiff about any situations on which he based the termination.  Defendant Hausfeld simply stated "I don't need to."  Plaintiff stated that this was "especially troubling, given that we are a law firm, and pride ourselves on standing up for the rights to a hearing and due process."  Defendant Hausfeld said nothing.  Plaintiff said this was a "kangaroo court."  Defendant Hausfeld said that it was "not a kangaroo court," but supplied no further detail.[2]

235.    Defendant Hausfeld then stated "contrary to perceptions, I'm aware of everything at the firm" and how people in the San Francisco office get along with people in the D.C. office.  He mentioned two attorneys, partners Rich Lewis and Brian Ratner.  Plaintiff immediately stated that he had never worked with Mr. Lewis, had met him once about three years ago, talked for about five

---

[2]    In a submission in the book *Beyond a Reasonable Doubt*, (Phoenix Books, 2006, Larry King, Editor), Mr. Hausfeld wrote at page 191 that "All people of all societies must be secure from the exercise of arbitrary or abusive power – whether committed by government officials, or knowingly aided by natural or corporate persons.  There must be accountability to a rule of law which defines and proscribes that conduct.  The cost of failing to recognize and enforce that rule is the loss of liberty."

COMPLAINT

minutes and that was it.  Plaintiff stated he also had never worked with Brian Ratner on a case, had barely ever spoken with him, and stressed that neither of those individuals even had ever worked on the *NCAA* Litigation.  Defendant Hausfeld provided no additional detail.  Plaintiff again stated that it was very troubling that Defendant Hausfeld would never have spoken to Plaintiff once before firing Plaintiff just to make certain that he had all relevant information.

236.    Plaintiff stated to Defendant Hausfeld that he does not see how Michael Lehmann and Chris Lebsock are when he is not around.  Plaintiff referred to his meeting in 2011 with Plaintiff and another San Francisco office attorney, Arthur Bailey, Jr., in which Michael Hausfeld invited them to the D.C. office for various meetings.  Defendant Hausfeld had invited Plaintiff and Mr. Bailey to a Starbuck's before coffee before the work day, and discussed his plans for the San Francisco office. Defendant Hausfeld had expressed displeasure with Mr. Lehmann's leadership of the San Francisco office, noting that there were a number of important West Coast cases in which the firm had not obtained leadership positions.  He further spoke at length about Mr. Lehmann always taking a back seat to various Bay Area firms.  He stressed that he wanted the San Francisco office to carve out a much bigger role, gain prominence, overtake what he saw as rival Bay Area firms, and stressed how those firms did not have a "next generation" in place.  He stated that he wanted the San Francisco office to make a major impact.

237.    Mr. Hausfeld did not respond at all to this reference about Mr. Lehmann and Mr. Lebsock and "how they are when he's not around" as he knew exactly what Plaintiff meant, their devious activities.  Plaintiff stated that "you're making the wrong choice."

238.    Plaintiff further stated "I guess it's been decided."  Michael Hausfeld confirmed "Yes, it's been decided."

239.    During the firing meeting, co-counsel Allan Steyer walked in to Plaintiff's office, expecting that the case team meeting was convening.  Michael Hausfeld shooed him out of Plaintiff's

office and Mr. Steyer looked confused. Later during the firing meeting, firm attorney Bruce Wecker walked in. Again, Defendant Hausfeld shooed him away, and Mr. Wecker looked puzzled.

240. Plaintiff, Defendant Hausfeld, and Ms. Haire, at Plaintiff's urging, spent the majority of the time in the firing meeting discussing how this would impact the *NCAA* Litigation and the clients in that case.

241. Bizarrely, Defendant Hausfeld stated that the *NCAA* case is "done." He continued "either the court will grant our motion for summary judgment or it won't." This was the motion that he announced in Court that day to Magistrate Cousins that, to Plaintiff's knowledge, has never been filed as of today's date.

242. Defendant Hausfeld then stated that "I'd like you to come back into the case in some other capacity, either on your own or with a different firm" but it "would not be in the same role." He did not explain what he meant, but then stated "a potential role could be continuing to work with the clients" and "I'd really like you to think about that."

243. Defendant Hausfeld further stated that "I know you would run through brick walls for the NCAA case."

244. Defendant's last words before walking out of Plaintiff's office were "I want this process to take place with dignity. I'll leave you to discuss the severance package with Kelly."

245. On November 13, 2012, Plaintiff wrote to the contact personnel at Defendant Hausfeld that were identified as being his points of contact for any post-termination matters. Plaintiff noted that "there are dozens and dozens of class action law firms with active litigation against [the Asian Electronics Manufacturers.]" Plaintiff asked Defendants to state what their relationship is with the Asian Electronics Manufacturers, and pointed out that to seek any employment with any law firm Plaintiff would need to disclose potential conflict of interest issues that may be imputed to him. Defendants did not respond to the email.

COMPLAINT

**DEFENDANTS' VIOLATION OF PUBLIC-POLICY**

246.    Virtually every State has a codified prohibition against attorneys maintaining conflicts of interest.  The prohibition is further reinforced and applied through court decisions.

247.    Rule 1-100 of the "Rules of Professional Conduct of the State Bar of California" states that the rules "have been adopted by the Board of Governors of the State Bar of California and approved by the Supreme Court of California pursuant to Business and professions Code sections 6076 and 6077 to protect the public and to promote respect and confidence in the legal profession. These rules together with any standards adopted by the Board of Governors pursuant to these rules shall be binding upon all members of the State Bar . . . The prohibition of certain conduct in these rules is not exclusive. Members are also bound by applicable law including the State Bar Act (Bus. & prof. Code, §6000 et seq.) and opinions of California courts."

248.    Subsection D(2) of that same rule states: "(2) As to lawyers from other jurisdictions who are not members:  These rules shall also govern the activities of lawyers while engaged in the performance of lawyer functions in this state; but nothing contained in these rules shall be deemed to authorize the performance of such functions by such persons in this state except as otherwise permitted by law."

249.    Rule 3-310 is titled "Avoiding the Representation of Adverse Interests."  Among other things, its states that

"(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal

COMPLAINT

relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation."

250.    Rule 3-310 further states:  "(C) A member shall not, without the informed written consent of each client: . . . (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

251.    Similarly, virtually every State, including California, has ethical prohibitions against solicitation of clients, including California.

252.    Similarly, virtually every State, including California, has ethical prohibitions against misrepresentations to clients.

**DEFENDANTS' LONG HISTORY OF QUESTIONABLE CONDUCT**

253.    Defendants have run afoul of their duties in recent years, including to federal judges, class members, and co-counsel representing plaintiffs.   Plaintiff sets forth some of these matters herein so as to further demonstrate the plausibility of Defendants' actions given their other conduct, and a pattern and practice of misbehavior of which Plaintiff is but the most recent affected party.

254.    Defendant Michael Hausfeld has been found by federal courts to have acted "in

COMPLAINT

bad faith," to have failed to act with candor towards a federal court overseeing a settlement process, to have improperly retaliated against others, and has engaged in a litany of increasingly troubling conduct in recent years. In *In re: Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 237 (D.D.C. 2005), the federal court ordered Mr. Hausfeld to pay approximately $1 million to a cocounsel it deprived of legal fees, stating that Mr. Hausfeld "rolled the dice . . . Hausfeld could see a storm coming . . . Hausfeld knew of the bad blood between himself and [the other firm.] Making an allocation of the fee without consulting anyone except itself was obviously looking for trouble . . . it will have to pay the price of the mistake that it made . . . I have tried to emphasize the demanding level of trust that is imposed by the court on lead counsel . . . [the Court will not be] condoning what I consider to be unacceptable behavior by lead counsel . . . [or] fundamental deviations from what this court can reasonably expect when it delegates the responsibility to lead counsel." (emphasis added). The Court rejected Hausfeld's invitation for it to address his contention that the co-counsel firm had an "unfounded vendetta against Michael Hausfeld." Id., at 242, n.17.

255.    More recently, in *Michael Hausfeld v. Cohen Milstein Sellers & Toll, PLLC*, No. 06-CV-826, 2009 WL 4798155, (E.D. Pa. Nov. 30, 2009), the federal court adjudicated the highly unpleasant fall out from Mr. Hausfeld's prior law firm firing him, and repeatedly rebuked Mr. Hausfeld.   In an Order dated November 30, 2009, United States Magistrate Judge Timothy Rice entered a Judgment against plaintiffs Michael Hausfeld and Richard Lewis and in favor of Cohen Milstein Sellers & Toll, PLLC "with respect to the distribution of attorneys' fees award to Hausfeld LLP from the case, *In re Int'l Air Transp. Surcharge Antitrust Litig.*, No. 06-1793 CRB (N.D. Cal.)." (Order, at 1).  The Court further stated that Messrs. Hausfeld and Lewis "are directed to wire $1,537,934.06 to [Cohen Milstein] within 48 hours of this order."  The Court concluded that "Both parties acted in bad faith . . ." (Order, at 2).

COMPLAINT

256.   On the same day that its Order was entered, the federal court in Philadelphia entered its very-detailed 36 page "Findings of Fact and Conclusions of Law," following its 4 day evidentiary hearing in the matter.  That document includes the following statements from the federal court:

- "This case requires examination of the inner-workings of a major class-action law firm, Cohen Milstein Hausfeld & Toll, PLLC ("CMHT"), which suffered an arduous break-up, resulting in two separate firms, Cohen Milstein Sellers & Toll, PLLC ("CMST") and Hausfeld LLP ("HLLP"). Even after the parties settled disputes arising from the break-up with judicial assistance, their mutual mistrust and bare-knuckle tactics spawned new disputes involving more than $17 million in legal fees and capital accounts."

- "In the settlement conferences in my chambers, Hausfeld never mentioned HLLP [Hausfeld's new law firm] intended to give [Hausfeld's] London firm a percentage of the Air Passenger fees before HLLP split the total fees." (Page *8).

- "Without notifying CMST [Hausfeld's prior law firm] or me [the federal judge], HLLP wired $3,075,868.12 to the [Hausfeld] London firm." (Page *11).

- "HLLP had no authority to divide the award among three firms, wire $3,075,868.12 to the [Hausfeld] London firm, and place CMHT's alleged share into its own escrow account before informing CMST or me of its deviation from the Confidential Agreement. Its unilateral actions violated the letter and spirit of the Confidential Agreement." (Page *15).

- "HLLP took an extraordinary risk by unilaterally sending $3,075,868.12 to the [Hausfeld] London firm." (Page *18).

- "HLLP must pay CMST its remaining portion of the Air Passenger fees, $1,537,934.06, within 48 hours of this Order." (Page *18).

- "Eighteen days before the evidentiary hearing, however, HLLP unilaterally chose to retaliate by transferring approximately $3 million of the Air Passenger fees to the [Hausfeld] London Firm . . .

- "Rather than seek judicial resolution, which is the hallmark of our legal system, HLLP attempted to dispense its own form of justice. . . . HLLP acted in bad faith." (Page *18) (all emphasis added).

257.   There are four days' worth of publicly available trial testimony in the docket.  It includes adverse testimony from numerous of Mr. Hausfeld's partners, and describes Mr. Hausfeld "screaming" and "yelling" at his firm's managing partner upon learning that Mr. Hausfeld's partners disagreed with him on numerous issues including the operation of the London office that

COMPLAINT

Mr. Hausfeld established and that was losing millions of dollars per year.

258.    In *In re Municipal Derivatives Antitrust Litig.*, MDL No. 1950, Case 1:08-md-01950-VM, U.S. Dist. Ct., S.D.N.Y., Letter from the New York Attorney General's Office to Judge Marrero, Docket No. 317, July 12, 2011, pages 1 and 2: "The Working Group of 25 States (the "States") writes in response to Interim Class Counsel's [led by Michael Hausfeld] July 8, 2011 letter to Your Honor requesting that the Court stay the implementation of the States' $92 million settlement . . . Interim Class Counsel continue to press their baseless arguments . . . Class Counsel falsely suggests that the similar size of the settlements between BAC, UBS, and JPMC indicates that the States did not tailor its damages analysis to the wrongful conduct of the settlement defendants . . . Over the last seven months, Interim Class Counsel's dilatory tactics have harmed and continue to harm the very entities it ostensibly represents by denying them the opportunity to consider the merits of participating in the settlements the States have procured in an exercise of their enforcement authority . . . these tactics must stop . . ." (emphasis added).

259.    Mr. Hausfeld unfortunately pushed a series of unsuccessful actions against other plaintiffs' lawyers in the mid-2000s stemming out of antitrust actions against Microsoft. Initially, Federal Judge Motz rejected Mr. Hausfeld's efforts to secure preliminary approval of a dubious and heavily disputed class action settlement, objected to by other plaintiffs' counsel, that envisioned the creation of a new entity. *See In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519, 527(D. Md. 2002), stating that "the present record establishes that the Foundation contemplated by the agreement is critically underfunded." (emphasis added). Hausfeld then launched cases against other plaintiffs' lawyers that had successfully settled numerous state court cases against Microsoft, seeking a cut of their legal fees. *See, e.g.*, James Rowley, "Legal Fee Fight Erupts over Microsoft Case," Seattle Times / Bloomberg, Jan. 7, 2004 ("Hausfeld and [another lawyer] have asked U.S. District Judge Frederick Motz in Baltimore, the judge overseeing the nationwide case, to 'fairly

COMPLAINT

compensate' them . . ."

<http://seattletimes.com/html/businesstechnology/2001831184_micrlawyers07.html> (last

visited, November 16, 2012); Laurie Cunningham, "Lawyers in U.S. Microsoft Case Want Cut

of Fees in Miami Suit," Daily Business Review (the Florida "3rd District Court of Appeal seemed

unsympathetic. 'You got paid for your case in federal court and now you want to get paid for

their case?' Judge Juan Ramirez Jr. asked. 'How is that fair?'"

<http://www.law.com/jsp/article.jsp?id=1090180159272> (last visited November 16, 2012)

See also Rankin et al. v. Microsoft, No. 00 CVS 4073, Superior Court, Wake County, State of

North Carolina, June 10, 2004 (detailing other court rejections of Mr. Hausfeld's efforts against

other plaintiffs' counsel in federal court, and in state court in Tennessee and Florida, denying his

motion to intervene, and stating that "The Federal Action Plaintiffs' Attorneys were never the

attorneys of record. "Further delay of the settlement in order to resolve a fee dispute can only

have adverse consequences that would frustrate the public policy goals that the settlement might

perpetuate . . . and would delay . . . benefit [to] the most under-funded public schools in North

Carolina . . . The Court does not find a legal argument to support the intervention nor does it find

the interests of the North Carolina class should be delayed or prejudiced in order to resolve a fee

dispute between attorneys."

<http://www.ncbusinesslitigationreport.com/Order%20denying%20motion%20to%20intervene.r

tf> (last visited November 16, 2012).

**The Elvin Bethea Situation**

260.    On August 9, 2012, former NFL player Elvin Bethea, a professional football player

with the Houston Oilers from 1968 – 1983, and a member of the Hall of Fame, posted the following

information on "Dave Pear's Blog – the Unofficial Blog for Independent Football Veterans" (located

at (http://davepear.com/blog/) :

Defendants represent Mr. Bethea in multiple matters.  Mr. Bethea wrote:

"Many attorneys want to represent us right now. The question is… who can we trust? I want other players to know that my name has been misused without my permission. Attached are two recent e-mails I had sent to attorney Michael Hausfeld. About ten (10) days after I sent the second e-mail, I finally received a call from Michael Hausfeld. He did not apologize and did not agree to the retraction that I had requested in my e-mails to him. . In the conversation with Michael Hausfeld, he also told me that Fred Dryer was joining a board that he was currently organizing. I called Fred to ask if this was true; Fred said that he had no knowledge of the Board or a Committee and that he had not even spoken with Hausfeld about it. . I did not know where else to turn for advice on what I can do to have my name removed from that letter to the AFL/CIO. So I contacted my friends at Dave Pear's Blog to see if they would kindly post my unanswered requests. . All this to say again …Who can we trust?

Elvin Bethea

261.    The operators of the website posted copies of emails from Mr. Bethea to Defendant Michael Hausfeld as follows:

**Subject:** NFLPA letter sent to AFL-CIO
**From:** "Elvin Bethea"
**Date:** 7/17/2012 2:01 PM
**To:** "Michael Hausfeld"

Mr. Hausfield

It has come to my attention that you used my name in a letter you sent June 20, 2012 to the President of the AFL CIO regarding the NFLPA, claiming I had signed that letter and that it was written on my behalf, along with other Hall of Famers and retired players. I did not know about that letter or give you permission to use my name, and I find it particularly outrageous and wrong that you did so while representing retired NFL players for the **unauthorized** use of our names and images in NFL films in the Dryer v NFL lawsuit.

I **demand** you publicly apologize and retract your claim of my support for your letter and efforts in the exact same manner as you publicized the letter, and do it immediately.

My friends and other retired players should know that you have misrepresented my participation and I insist they not be misled into thinking I endorsed your letter.  Your efforts, however they may benefit you, should not be confused with genuine concern for me or other retired players.

Sincerely,
Elvin L Bethea

COMPLAINT

**Subject:** Letter , June 20th
**From:** "Elvin Bethea"
**Date:** 7/26/2012 9:29 AM
**To:** "Michael Hausfeld"

Mr. Hausfeld

I received a call from one of your assistants, you used my name without my knowledge or permission, not your assistant, you signed the letter. That was unethical and wrong, especially from a lawyer representing me in the Dryer case against the NFL for virtually the same thing.

I demanded an apology from you, not the assistant you had call me and I want it exactly as publicly as you misused my name. I want it sent to all the same players and press.

I expect this to be done immediately. You sent the letters to the AFL-CIO on June 20th and how did your letter help retired players or the Dryer case, anyway? What is the point of your suggesting the AFL-CIO expel the NFLPA?

Elvin Bethea

262.     Ken Belson of *The New York Times* had reported on the situation as follows in an

article on June 21, 2012 titled "N.F.L. Retirees Ask A.F.L.-C.I.O. to Expel Players Union for 'Moral

Failures'" as follows:  A group of retired N.F.L. players has asked that the players association be

expelled from the A.F.L.-C.I.O. for failing to represent the retirees' interests.  In a letter sent to

Richard L. Trumka, the president of the A.F.L.-C.I.O., a lawyer for retirees including Lem Barney,

Elvin Bethea, John Riggins, Ken Stabler and Roman Gabriel said that the players union should be

thrown out because of "moral failures and conduct unbecoming of a union."

263.     In the letter, the retirees claimed that their pensions and disability programs were

inadequate and that there was a lack of a "comprehensive approach to monitor, detect, treat and care

for retirees suffering the consequences of head trauma-related brain injuries."

264.     The same day as Mr. Hausfeld made the request, the AFL-CIO summarily rejected it.

As Mike Florio of NBC Sports.com reported:  "The NFLPA didn't officially respond to the effort by

20 former players to expel the union from the AFL-CIO, perhaps because it didn't need to.

AFL-CIO president Richard Trumka has rejected the request, communicated in a letter written by

COMPLAINT

lawyer Michael Hausfeld, to kick the football players' union out of the organization . . .

So there you have it. On the very same day the request was made, the request was rejected."

<http://profootballtalk.nbcsports.com/2012/06/21/afl-cio-quickly-rejects-request-to-expel-nflpa/>

(last visited January 14, 2013).

265.     Defendants to this day have refused to retract their statements regarding Mr. Bethea. In an amazing display of hubris, Defendants continue to maintain information on their website that wrongfully uses Mr. Bethea's name.

266.     The press release that the Hausfeld firm issued specifically referenced that "Twenty former NFL players, including seven Hall of Famers, have signed a letter requesting that the National Football League Players Association (NFLPA) be expelled from the AFL-CIO. The players—including Joe DeLamielleure, Paul Krause, Lem Barney, Bruce Laird, John Hannah, Elvin Bethea, Ron Yary, Conrad Dobler, John Riggins, Al "Bubba" Baker, Reggie McKenzie, Billy Joe Dupree, Ken Stabler, Roman Gabriel, George Visger, Tommy Nobis, Fred Smerlas, Art Sill, Myron Pottios, and Lou Piccone—filed the grievance with the AFL-CIO on behalf of themselves and all other similarly situated retired NFL players." It is still available on Defendants website here: http://www.hausfeldllp.com/pages/press_releases/562/retired-nfl-players-call-for-afl-cio-to-expel-nflpa (last visited January 14, 2013).

267.     The Hausfeld firm further has the letter from Defendant Hausfeld posted to this day on its website, specifically listing Mr. Bethea, here:

http://www.hausfeldllp.com/content_documents/16/06202012LettertoAFL-CIO.pdf

**The Dan Pastorini Lawsuit**

268.     Former NFL quarterback Dan Pastorini, a client of Defendants, recently sued them for legal malpractice, breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. The matter is captioned *Dante Anthony Pastorini, Jr. v. Michael D. Hausfeld,*

*and Hausfeld LLP*, Case No. 2012-69551, 190th Judicial District, District Court of Harris County,

Texas (filed November 12, 2012).

**A Matter Currently Subject to a Gag-Order**

269.    Another relevant matter is currently subject to a court imposed "gag-order" while

certain events occur.  This matter can be discussed at a future time.

**Books Written with Defendant Michael Hausfeld's Cooperation.**

270.    The book *Inside a Class Action*, written with extensive access to Mr. Hausfeld

and his cooperation and based on thirty hours of recorded interviews with Mr. Hausfeld, quotes

from a letter from Mr. Hausfeld's co-lead counsel Robert Swift to U.S. District Judge Korman

stating that Mr. Hausfeld "has been secretive and divisive, and we would have no confidence in

his judgment going forward," (page 103), and elsewhere makes reference to Mr. Hausfeld

excluding co-counsel from negotiations (page 239, 241), mocking co-counsel, passing secret

notes deriding them during presentations and showing the note to the author (page 203). Jane

Schapiro, *Inside a Class Action* (University of Wisconsin Press, 2003).

271.    With respect to failures to consult with a case's plaintiffs' Executive Committee, the

book further states "When he got impatient, there were those who thought his obstinacy and

arrogance took over." (p. 231), and describes repeated "yelling," "bellowing," and swearing at his

co-counsel.  (page 164, 165, 214).

272.    *Inside a Class Action* further describes how Mr. Hausfeld "set up each case like a

board game . . . Those who shared his vision were good, and those who differed were bad."

(page 35). That approach is evident now; Plaintiff apparently falls on the "bad" side of Defendants'

calculus.

273.    The book *The Victim's Fortune*, by John Authers & Richard Wolffe (Harper Collins

2002), was written with cooperation from Mr. Hausfeld (noted at page 439), by two reporters for

*Newsweek* and *Financial Times*. It states at page 42 that "Swift and Hausfeld had once worked together at the same law firm, but the firm had split, amid acrimonious circumstances. The two men treated each other with wary distrust."

274.   The book further quotes at 191 one of the nation's most prominent attorneys at the time as saying, with respect to Defendant Michael Hausfeld, "I just felt that if you are a partner you keep someone you keep them informed. But that was not what they did. That created a lot of tension. That's Michael's modus operandi. He does this all the time in all the cases that we are in with him. He's a loner. He doesn't consult. Apparently he thinks he's smarter than other people, and it's a very uncomfortable situation."

275.   The book further states that Robert Swift stated, at page 226, with respect to Mr. Hausfeld's conduct in settlement negotiations that "What I simply didn't appreciate was Hausfeld telling me one thing and then doing another. He just wanted to do something himself. I was not going to play along with that game."

276.   The book further refers at page 231 to a leading plaintiff's attorney and Mr. Hausfeld's co-counsel referring to certain of Mr. Hausfeld's actions as "a classic conflict of interest" and a non-lawyer stating to Mr. Hausfeld "I refuse to watch you behave like my little children when they were in prekindergarten. All prekindergarten children have an important rule with regard to property – what's mine is mine and what's yours is mine too."

277.   The book further cites at page 341 to David Boies, who represented a federal judge in appellate proceedings relating to her finding that Mr. Hausfeld suffered from a conflict of interest. Mr. Boies states "You had a negotiation in which lawyers who were representing multiple classes of plaintiffs were in effect trading off one group of plaintiffs' claims in favor of another. The way it came down, you had a very troubling situation."

278.   The book further cites at page 346 another lawyer as stating that lawyers on Mr.

Hausfeld's team were angry at Mr. Hausfeld for his handling of the situation, and stating that "Boies outsmarted him." Then, the book states that "Hausfeld called Boies in a frantic attempt to lobby him to change the judge's language," and quotes Mr. Boies, later reflecting on the situation, as stating that "'I think there were some people who had fallen into a very unfortunate rhetorical action,' he recalled, 'They were so offended that this federal judge had the temerity to disagree with them that they were on the attack.'"

279.    Then, when the matter went on appeal to the United States Court of Appeals for the Second Circuit, the book quotes Judge Jose Cabrenes at page 348 at the hearing as stating "This Hausfeld declaration appears to be simply a fig leaf of some sort. It sounds like a bit of a con quite frankly. It doesn't sound authentic."

280.    In the book *Imperfect Justice* (Public Affairs, 2003), United States diplomat Stuart E. Eizenstat, who served in several high-level positions in the State, Treasury, and Commerce Departments in the Clinton Administration from 1993 to 2001, writes, in a book that Mr. Hausfeld cooperated with (see pages 376-79), at page 82 that Defendant Hausfeld "could be sweetness and light at one moment and anger and darkness the next." He further writes at page 84-85 that "The already poisonous atmosphere between the two groups was hardly improved by the fact that Hausfeld had left the Washington office of Swift's Philadelphia law firm after an acrimonious split." On page 226, he notes that "I heard their often infantile, ego-driven maneuvers, quarrels, and manipulations, peppered with accusatory words like 'scandalous," 'double-crossed,' 'poisonous,' 'evil' and 'worse." The book further notes at page 344-45 the "fog of rhetoric, recrimination and threats of sanctions" in the cases, and that "Bullying at times went beyond the bounds of propriety"

281.    On page 86, the book recounts a family member, stating "She'd hear him at night shouting on the phone . . The same names kept cropping up. [citing his co-counsel's names.] There were too many [cases], and every one seemed fraught with personality conflicts. How often had she

COMPLAINT

heard him yelling about somebody?"

282.    The book further notes that he "barked" at his secretary (page 145) demanding information and how he "glared" at his co-counsel.

283.    The book *Roberts vs. Texaco* by Bari-Ellen Roberts (a lead plaintiff in one of Mr. Hausfeld's cases) and Jack White (Avon Books, 1998), states at page 254 that "By now, Michael Hausfeld was going berserk on a daily basis. 'Get me those fucking tapes,' he screamed at Cyrus [a young attorney at Hausfeld's firm whenever he saw him. 'I want those fucking tapes.' In Cyrus's view, Hausfeld was being reckless. But as a young lawyer and not yet a partner, Cyrus did not have the stature to fight a legal legend like Hausfeld alone. In desperation, he appealed to Cohen, Milstein's senior partner, Herbert Milstein, to weigh in on the side of caution in dealing with Lundwall. The very thought of going slow made Hausfeld furious. "Caution? Fuck that," he shouted at Cyrus. "If you don't get me those fucking tapes, this case is going to go on for another ten years!  The delay will be all on your head!"

## CAUSE OF ACTION

## FIRST CLAIM FOR RELIEF

### Wrongful Termination in Violation of California Public Policy

### (Against All Defendants)

284.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

285.    California has a specific public policy of prohibiting attorneys from maintaining conflicts of interest.  This policy is delineated in statutory provisions, rules promulgated in accordance with those provisions, and in interpretative caselaw.

286.    California's policy inures to the benefit of the public rather than serving merely the interests of Plaintiff.

COMPLAINT

287.   California's policy was well-established at the time of Plaintiff's termination by Defendants, and is substantial and fundamental.

288.   Defendants employed Plaintiff.

289.   Plaintiff had reasonably-based suspicions that Defendants' conduct violated California's conflict of interest rules.

290.   Plaintiff reported his concerns to Defendants.

291.   Defendants terminated Plaintiff's employment.

292.   Plaintiff's reporting of conflict of interest issues was a motivating reason for Defendants' termination of Plaintiff.

293.   Defendants' termination of Plaintiff was the proximate cause of Plaintiff's injuries.

294.   Plaintiff suffered damages as a result of Defendants' actions.

295.   Defendants' conduct amounts to oppression, fraud, or malice, such that exemplary / punitive damages are appropriate for the sake of example and punishing Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

A.   That judgment be entered for Plaintiff against Defendants for the damages sustained by Plaintiff as allowed by law, together with the costs and expenses of this action, including reasonable attorneys' fees;

B.   That Plaintiff be awarded any available prejudgment and post-judgment interest;

C.   That Plaintiff is entitled to Declaratory Relief declaring that Defendants' termination of Plaintiff was in violation of law;

D.   That a permanent injunction be issued requiring Defendants to disgorge to class members all of the legal fees that they have obtained in numerous matters tainted by conflicts of interest.  These ill-gotten fees amount to many millions of dollars.

COMPLAINT

E.     That a permanent injunction be issued requiring Defendants to provide full and complete information regarding their conflicts of interest to all courts presiding over any matter affected by the conflicts described herein.

F.     That a permanent inunction be issued requiring Defendants to institute and adhere to a robust conflicts of interest checking and evaluation system, and requiring Defendants to submit to oversight of an ethics monitor for at least three years that will prepare quarterly reports to the Court regarding Defendants' compliance with legal ethics.

G.     That Plaintiff have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.


Dated:  January 17, 2013                         Respectfully Submitted,

                                                 LAW OFFICES OF JON T. KING

                                                 By: _____

                                                 Jon T. King (Cal. Bar No. 205073)
                                                 856 Walbrook Ct.
                                                 Walnut Creek, CA 94598
                                                 Telephone:  (925) 698-1025
                                                 Email:  jtk70@comcast.net

                                                 *Counsel for Plaintiff*

COMPLAINT